## UNION OIL & MINING CO. et al. v. BOWMAN.

No. 19475. Opinion Filed April 29, 1930.

Rehearing Denied June 24, 1930.

Commissioners' Opinion, Division No. 2.

West, Gibson, Sherman Davidson & Hull, for plaintiffs in error.

McCollum & McCollum, for defendant in error.

HALL, C. This was an action for damages for polluting a stream of fresh water by the drainage of salt water, oil or base sediment escaping from tanks or reservoirs containing oil and these other named substances. The plaintiff was the owner of 80 acres of land across which there flowed a creek, a perpetual stream of fresh water fed by numerous springs. Along the banks of the creek it appears there was a considerable growth of trees such as oak, walnut, and other varieties. The defendant owned and operated an oil lease adjacent to plaintiff's land. On said lease there were a few oil wells which it was necessary to pump in order to obtain the oil. The result was the production of more salt water than oil. This salt water when separated from the oil, together with what is termed BS (base sediment from crude oil), was stored in reservoirs or ponds. About 15 barrels of salt water from these ponds escaped and drained into plaintiff's creek every 24 hours. Also, defendant cut the dam of one of these ponds and permitted this base sediment and salt water to flow down a ravine into this creek, thereby polluting the water. Testimony on behalf of plaintiff and his witnesses was to the effect that the stream, its banks, and a small area of bottom land adjacent to the banks, were completely "plastered" with this oil or base sediment. The testimony further discloses that, within a short period of time thereafter, the oil on this creek became ignited and created a fireworks the entire distance which it traversed plaintiff's land, destroying vegetation, killing and destroying the trees along the banks of the creek.

The testimony tended to show that the value of the 80 acres of land before this stream was polluted, was about $30 per acre, or $2,400: and that afterwards, that is, after the pollution of the stream and the destruction of the trees, its value about $1,000 or $1,200. It was the contention of plaintiff that, in addition to the esthetic or ornamental value of this creek, it was of considerable value to him, and as an added value to the land as a watering place for his stock. It does appear that the creek did have a considerable flow of pure, fresh spring water. The plaintiff asked for damages in the sum of $1,400, alleging a perma-

nent destruction of the creek, except as a drainage ditch, after its pollution in the manner described. The jury returned a verdict for plaintiff in the full amount prayed for. Judgment was rendered, and the defendant appealed.

The major portion, or practically all of defendant's brief, is directed at the proposition that there can be no permanent injuries to a stream of water by reason of the escapement or drainage therein of a quantity of salt water; that is, water impregnated with sodium chloride which we know as common salt, together with traces or small quantities of other saline substances possessing similar characteristics as to solubility of common salt. If this controversy were based solely or substantially upon the contention that either a small quantity or a large quantity of common salt was deposited into a flowing stream, and that such chemical destroyed the stream or created a permanent injury thereto, we would without hesitation reverse this judgment. The above statement, however, is made upon the assumption that the escapement of salt in the stream would terminate at some future time not too remote.

It is common knowledge that salt is a highly soluble substance. Water is its natural solvent. That is elementary knowledge, and it is as old as the history of man. School children in the primary grades are taught that rain water is constantly picking up the salty substances and solutions on the surface of the earth and in the small streams, and in solution carrying it into the large bodies of water having no outlets, such as the different seas or ocean; and by this process the watersheds and waters in the moving streams are kept fresh, and the water in these oceans is made salty. In our own country, it is said that Great Salt Lake, whose legendary name was Lake Bonneville, was once a body of pure, fresh water when it had an outlet into the Pacific Ocean. Now it has no outlet, and the streams flowing into it have picked up so much common salt from the watersheds that it now contains such a high percentage of salt that animal life in it has become extinct.

While plaintiff's testimony was somewhat dramatic regarding the impregnation of this creek with this saline substance, yet his cause of action was "double-barreled" or "drag-net" in its nature. He put as much stress upon the destruction of the creek from the result of the oil and base sediment as he did from the effect of salt water. In connection with the alleged injury from oil or BS. plaintiff testified as follows:

"A. The creek was full, everything covered and loaded with oil; you couldn't drive from one field to the other across the creek without getting all over oil; no water from the stream for the stock; had to get water from the other lease. * * *

"A. It burned everything along there that might have been in reach of it; damaged a lot of trees, burned the limbs off clear to the top, probably 30 feet high; killed a lot of trees along the creek that were anywhere near the fire. * * *

"A. The creek was soaked from one end to the other, and when it started, it just burned all the way, that is all; everything was full of oil, reeking of oil."

Another witness introduced by plaintiff, an old man who cultivated the land, who seemed to be absolutely honest and sincere, testified as follows:

"A. Well, I will tell it as nigh as I can, gentlemen, I wouldn't tell a false one for the whole world, for I ain't long to stay here. * * *

"A. Well, it burned on the oil on the creek, and this here prairie grass along that creek had grown over waist high, maybe higher, and when it caught in that, the oil got to popping and snapping, and, gentlemen, it run over the tops of them trees, the big blazes, and it would just whip and whip, and we had to put our team away up in the field."

We are inclined to the view that where a large quantity of oil, or oil sediment known as base sediment, escapes into a stream of water and is deposited on the banks, around the trees and in the folds of the sand or earth, in the bottom of the stream, which is a natural consequence where water is running, the injury, in a relative or practical sense, is of a permanent nature. The word "permanent" in its legal sense is not equivalent to "perpetual" or "unending" or "unchangeable." 3 Words & Phrases (2nd Ed.) 968.

The case of Coleman v. Bennett. 111 Tenn. 705. 69 S. W. 734, involving a permanent injury to land where the damages sought were the consequent depreciation of the market value of the land caused by the defendant wrongfully obstructing a stream, and thereby permitting water to flow across plaintiff's land covering it with sand, cutting it with deep gullies, rendering it practically worthless for farming purposes, the court said:

" 'Permanency,' in the legal acceptation of the term, does not include the idea of absolute, but only of practical, irremediability."

Oil, unlike salt, is not soluble, except by the slow process of oxidation, or by the action of certain powerful chemicals not pres-

ent in nature. It is clear that the destruction of trees along the banks of the stream was a permanent injury; and we cannot say that the witnesses and jury in the case here were in error in their conclusions that the premises in question had been permanently injured by the pollution of this creek with oil and oil sediment.

The defendant did not request the court to instruct the jury that they could not consider the effect of the presence of salt water in the stream as an element of a permanent injury to the land. Therefore, the evidence being sufficient to sustain the verdict on the theory of a permanent injury from the effects of oil or oil sediment, the judgment is hereby affirmed.

BENNETT, HERR, EAGLETON, and DIFFENDAFFER, Commissioners, concur.

By the Court: It is so ordered.