## ROXANA PETROLEUM CORP. et al. v. CITY OF PAWNEE et al.

No. 20982. Opinion Filed July 14, 1931.

Rehearing Denied Feb. 16, 1932.

Thompson, Mitchell, Thompson & Young, Joe T. Dickerson, Edward H. Chandler, Summers Hardy, Robert L. Imler, W. H. Zwick, J. C. Denton, R. H. Wills, J. H. Crocker, I. L. Lockewitz, and Simons, McKnight, Simons & Mitchell, for plaintiffs in error.

McCollum & McCollum, Thurman S. Hurst, and Preston R. Calvert, for defendant in error.

RILEY, J. This is an action brought by the city of Pawnee against Roxana Petroleum Corporation, now Shell Petroleum Corporation, Sinclair Oil & Gas Company, Marland Oil Company of Oklahoma, now Marland Production Company, Mid-Continent Petroleum Corporation, Healdton Oil & Gas Company, Oil State Petroleum Corporation, Imo Oil & Gas Company, Champlin Refining Company, Chas. E. Knox Oil Company, and Chas. E. Knox, to recover damages for the alleged destruction of its municipally owned water supply by reason of the pollution of Black Bear creek, from which it obtained its said water supply. The action was commenced July 16, 1927.

The petition alleges, in substance, that Black Bear creek runs by and through the corporate limits of the city of Pawnee; that prior to the pollution of the creek and the water therein, said creek furnished an abundance of water, fit and suitable for municipal and domestic use; that for more than 20 years next preceding the pollution of said stream, plaintiff, as a municipal corporation (town and city), had openly and continuously, under a claim of right, taken and acquired water from said stream for municipal purposes for the use and benefit of the citizens and residents of said municipal corporation; that it had acquired certain lands on either side of said stream, and at an expense of more than $200,000 had constructed its municipal plant on the banks of said creek, and installed pipes, mains, meters, etc., required for a complete water system, sufficient and adequate to supply its inhabitants, about 3,000 in number, with water for municipal and domestic purposes; that it has no other adequate and available source from which to obtain a water supply; that a large territory lies within the drainage area of said creek above the city; that the Garber-Covington oil field is located within said drainage area or watershed; that defendants and each of them were, and had been, engaged in the production of oil and gas, and had drilled a large number of wells within said area which had produced large quantities of oil and salt water. Plaintiff specifically described the land owned or leased and operated by each defendant, and further alleges that during the fall of 1925, and the first part of 1926, said defendants and each of them drilled a large number of wells on their respective leases, which, as soon as they were drilled in, commenced to produce large quantities of salt water, had ever since, and were then, producing salt water in large quantities. The petition then, with particularity, pleads the pollution of the stream by defendants allowing the salt water to escape and flow down and into Black Bear creek, and ultimately into plain-

tiff's reservoir, which was constructed by placing the dam across the stream at or near the pumping plant of the city. It is alleged that said field is an established oil field, and that the defendants have constructed great quantities of rigs, pumps, pipes, ponds, reservoirs, tanks basins, casinghead plants, and other permanent structures on their respective leases, and that large quantities of crystalized salt have been deposited on the surface of the soil and in the draws, ravines, and drains leading from the leases to the Black Bear creek, and on the banks and bed of said creek, and that the salt has penetrated out along the banks of said stream many rods from the oil field down toward the city of Pawnee; that the drainage over the oil, bottom settlings, and salt water on the surface, and the seepage from the earth saturated with such oil, bottom settlings and salt water, as aforesaid, does and will flow into said Black Bear creek and keep said Black Bear creek and the water therein contaminated and polluted, and the city of Pawnee indefinitely and permanently deprived of its source of water from said creek, and its supply of water and water rights, procured and acquired and held by it in said creek, are and will be permanently lost and destroyed; that, by reason of the acts and conduct of said defendants, as aforesaid, said plaintiff's source of water from said Black Bear creek and water rights secured, acquired and held by it on said creek, have been and now are wholly, completely, and permanently destroyed. It is then alleged that after the pollution of the water in Black Bear creek, plaintiff was compelled to and did obtain a temporary water supply from a small creek about three miles from the city known as Camp creek; that the temporary supply was inadequate and insufficient to provide said city with water; that it is across a high divide or elevation from the city, and that it was necessary to pump the water over said divide to the city treating plant at a cost to the city of approximately $650 per month over and above the ordinary cost of producing the water from Black Bear creek and placing it in the treating plant; that the cost of said temporary supply, and the extra cost of operating and maintaining same to the date of the filing of the petition, was $40,000; that the value of the water supply and water rights of plaintiff as existed prior to the pollution thereof was $225,000, and to acquire a similar quantity and quality of water as easily accessible would cost, and plaintiff would be compelled to pay therefor, the sum of $225,000.

Plaintiff prayed for judgment against de-

fendants in the sum of $265,000. Supplemental petitions were filed, claiming extra expense for operating a temporary plant between the date of the filing of the original petition and the date of the trial, by which the total amount claimed was raised to the sum of $273,499.61.

Defendants Sinclair Oil & Gas Company, Mid-Continent Petroleum Corporation, Marland Company, and Shell Petroleum Corporation (formerly Roxana) filed separate answers and amended answers denying generally the allegation of the plaintiff's petition, and affirmatively averred that after plaintiff had complained of the pollution of its water supply, plaintiff and said defendants entered into a certain written contract and supplemental contract by which it was agreed that said defendants would furnish, and it was alleged that they had furnished, plaintiff the sum of $40,000, to be used in the construction, operation and maintenance of the necessary plant to secure said temporary water supply, with the stipulation therein that the furnishing or acceptance of said sum, and the use thereof as stated, should not constitute a waiver of any of the rights, privileges, or immunities of either party, and should not affect the right of plaintiff to prosecute its claim for damages, nor the rights of said defendants to defend against the same, and was without prejudice to the rights of the several parties with respect to said claim for damages, and provided that, in the event the city should be adjudged to have a valid claim against said companies, then said amount so furnished by them should be credited upon the claim of the city. They also allege that by the expenditure of said money so furnished, the city of Pawnee had obtained an adequate supply of pure, wholesome water for all its domestic and commercial needs and purposes.

The other defendants answered by general denial and plaintiff replied to the answers by general denial.

The cause was tried to a jury, resulting in a verdict and judgment against the Roxana Petroleum Corporation, Sinclair Oil & Gas Company, Mid-Continent Petroleum Company, Marland Oil Company, Healdton Oil & Gas Company, and Oil State Petroleum Company, in the sum of $200,000.

Roxana Petroleum Corporation (now Shell Petroleum Corporation), Sinclair Oil & Gas Company, Marland Oil Company (now Marland Production Company), and Mid-Continent Petroleum Corporation join in an appeal making the plaintiff, city of Pawnee, other defendants against whom the judgment was rendered, defendants in error.

Healdton Oil & Gas Company and the Oil State Petroleum Company appeal by separate petition in error.

The petition in error of the Roxana, Sinclair, Marland, and Mid-Continent Companies contains some 38 specifications of error, but many of them are not presented in the brief, and a number of others are duplications.

The principal question presented by them is that the verdict is not sustained by sufficient evidence, and is contrary to the evidence.

In connection with this question is one that the court erred in admitting certain evidence of an expert witness. Another question presented is that the court erred in its instructions on the measure of damages and certain other instructions. It is also urged that the court erred in overruling separate demurrers of said defendants to plaintiff's petition.

The Healdton Oil & Gas Company and the Oil State Petroleum Company present four specifications of error. They are: Error in overruling their demurrer to plaintiff's evidence; error in refusing certain instructions offered by them; error in certain instructions given; and error in overruling their motion for judgment on the special findings of the jury, notwithstanding the general verdict returned against them.

The first proposition urged is that the verdict is not sustained by sufficient evidence and is contrary thereto. Included in this proposition is alleged error in overruling the demurrers to plaintiff's evidence. It is first contended that without the evidence of one W. F. McMurry, a witness for plaintiff, on the question of whether or not Black Bear creek was permanently polluted as a water supply for plaintiff, there is no evidence whatever tending to show that the pollution of the creek was permanent. It is contended that the evidence of the witness McMurry on this question was incompetent and should not have been admitted. He testified as a skilled or expert witness and gave his opinion to the effect that the water in the stream would never clear up so as to furnish plaintiff an adequate supply of usable water as before the pollution. If the testimony of this witness was admissible, it must be conceded that there is some evidence tending to prove that the pollution of the creek and the water supply of plaintiff was permanent.

The witness McMurry testified that he was by profession a consulting engineer, and specialized in water supply; that he had been thus engaged for seven years; that he

was a graduate of the School of Engineering at Vanderbilt University, Nashville, Tenn.; that he had worked on the Spavinaw project for the city of Tulsa, had charge of the field work for the Okmulgee project, the Henryetta project, the water supply for Holdenville and Prague, and had done some work at Houston, Tex., and his company had done work in Cuba, and that he also had done work on a number of small projects; that he was employed by the city of Pawnee as a consulting engineer in connection with the proposed possible water supply to take the place of the Black Bear creek supply, and had worked in connection with the acting city engineer, Mr. Oscar Sewell. He was examined and cross-examined at length concerning his work in connection with the proposed water supply, and what he had done and observed in connection therewith, and his experience in consulting work with reference to water supplies and other municipal work; his studies and work in connection with water sources as to quality and quantity of water, and his study of streams that had been polluted with salt water, as to whether or not such streams would be dependable and suitable sources of water supply, and as to his study and observation of Black Bear creek. He testified that he was familiar with its source, course, and general drainage area, and the land formation as far as the surface was concerned along the bed of the creek; that being employed by the city of Pawnee to ascertain the availability of dependable water supply, he had made a study whether or not it would be practical to look forward to the time of the clearing up of Black Bear creek. He was then asked the following question:

"Q. And taking into consideration your study of other streams, and the nature of Black Bear creek, the surface formations along the creek, the nature of the bed of the creek, as you have seen and observed them; taking into consideration the quantity of pollution of salt water that has been deposited in Black Bear creek, the same being of such a quantity that it highly contaminated the waters in Black Bear creek throughout the length of the creek from the Garber field to a distance up to and beyond the city of Pawnee, to the extent that it killed the fish and the water turtles in the creek, and rendered the water wholly unfit for stock purposes and human consumption; and that that pollution has continued from the early fall of 1925, up to the 10th day of May, 1929; and taking into consideration the fact that the Garber oil field is yet being operated, would, in your opinion, the waters of Black Bear creek clear up within any reasonable time, sufficient to render the water

fit and suitable for domestic and commercial purposes, and other purposes to which the city would put the water? * * * Q. Yes, and assuming that the water wells along the course of Black Bear, from a point near Perry, Okla., to a point beyond Skeedee, Okla., a number of which wells have become polluted, and these wells are located fiom approximately 100 feet from the channel of Black Bear creek to a distance of 40 rods. Now, with that additional element in my question, what would you say as to the waters in Black Bear creek clearing up so that the water would be fit and suitable for the domestic and commercial consumption of Pawnee City?"

After several objections, that part of the question asking for his opinion on whether the creek would clear up within any reasonable time. was eliminated, and the question was reframed so as to call for an opinion as to whether or not it could then, or at any time in the future, be relied and depended upon as a source of water supply. He answered that he did not think it would ever clear up as it was before. It is contended that this question has certain elements which are not supported by any facts coming within the knowledge of the witness, or testified to by other witnesses, and for this reason improper, and the answer should not have been permitted. Defendants say that, with the element as to study of the witness of other streams, they find no fault, but insist that that part of the question where the witness was told to take into consideration the "nature of Black Bear creek, the surface formations along the creek, the nature of the bed of the creek as you have seen and observed them," was not a sufficient basis for an expert opinion. As stated before, the witness testified that he was familiar with the general drainage area and the land formations as far as the surface was concerned along the bed of the creek. On cross-examination, he stated, "Fairly familiar with it."

Defendants cite no authority in support of their contention as to this point, but content themselves by saying "this was not sufficient basis for an expert opinion." The question as finally framed was, in part, in the nature of a question ordinarily propounded to a skilled witness, rather than one ordinarily propounded to an expert witness.

Opinion evidence is not necessarily expert evidence or evidence by an expert. It may be given by an ordinary observer (22 C. J. 518), a skilled witness (22 C. J. 519), or an expert witness (22 C. J. 522). Where the answer of a skilled witness is not based upon a hypothetical question asked him, but upon an examination made by him, the objection that the question was based on facts not in evidence is not sustainable. Boehm v. City of Detroit, 141 Mich. 277, 104 N. W. 626; McCowan v. Muldrow (S. C.) 74 S. E. 386.

In 22 C. J. 716, a general rule is stated as follows:

"It is not unusual that the witness examined as an 'expert' should also be a witness establishing in whole or in part, as the result of scientific knowledge or personal observation, the facts hypothetically assumed. There is no inherent objection to allowing a skilled observer also to testify as an expert, and indeed the importance to be attached to the judgment of an expert may be increased by reason of his having had opportunity for personal observation, * * * or the witness may be asked a question based in part on his observation and in part on the testimony of certain other witnesses."

In Phoenix Fire Ins. Co. v. Virginia Western Power Co. (W. Va.) 94 S. E. 372, it is held:

"It is proper for a witness called as an expert to give his opinion, based partly upon the knowledge he has of the subject-matter and partly upon hypotheses stated in the question."

In Loeb v. Davidson, 261 Pa. 418, it was held:

"While the usual practice is to receive the testimony of an expert in the form of answers to hypothetical questions, which he, for the purpose of his testimony, assumes to be true, an expert who had had occasion personally to examine the subject-matter of the inquiry, and who has personal knowledge thereof, may state the result of such examination."

In Baltimore v. Mattern (Md.) 104 Atl. 478, it was held:

"Testimony of plaintiff's physician, in answer to question partly hypothetical and partly based on knowledge, was admissible, where there was no substantial difference between plaintiff's testimony and that attributed to her in question, while answer showed opinion was based largely on observation."

In some jurisdictions it is apparently held that, before an expert or a skilled witness may give his opinion based partly upon his knowledge of the subject-matter and partly upon hypotheses stated in the question, he must first testify fully upon the result of any examination made by him, or knowledge acquired in any other way, of the subject-matter. But this, we think, goes largely to

the weight to be given to such opinion evidence rather than its admissibility. These matters may be brought out fully by cross-examination, either before or after the expression of the opinion.

Another so-called element of the question challenged by defendant is:

"* * * Taking into consideration the quantity of pollution of salt water that has been deposited in Black Bear creek, the same being of such a quantity that it highly contaminated the waters in Black Bear creek throughout the length of the creek from the Garber field to a distance of to and beyond the city of Pawnee, to the extent that it killed the fish and the water turtles in the creek, and rendered the water wholly unfit for stock purposes and human consumption. * * *"

The objection is that there was no evidence or showing as to how much pollution is necessary to kill fish and water turtles, and none to show how long the pollution remained at this strength, and there was no testimony as to how much pollution is necessary to render water unfit for stock purposes or human consumption. Here counsel for defendants are extremely technical. Much testimony had been given (in fact nearly 1,000 pages) tending to show the pollution of the creek, the source and extent thereof. A number of witnesses testified on this question. Some of them testified to the effect that the water in Black Bear creek had been so polluted by salt water that stock would not drink it, others to the effect that it had become so polluted with salt as to render it unfit for human consumption. Other witnesses testified that it became unfit for human consumption, or for use in boilers, etc., in the city of Pawnee, about December, 1925, or January, 1926. Other witnesses testified that the water was as bad or worse during the latter part of 1928. It would require too much space here to review the evidence in detail on this point. The record discloses that there could be no doubt but that the water in Black Bear creek had become so bad as to render it unfit for human consumption, and that the only substantial question was whether or not this pollution was to the extent and duration that it could, in law, be considered as permanent. As to the effect it had upon the water of Black Bear creek as a source of water supply for the city of Pawnee, there was an abundance of evidence upon which to base this portion of the question.

The next element objected to is, "Assuming that the pollution has continued from the early fall of 1925, up to the 10th day of May, 1929." The objection is that this portion of the question assumes that the pollution continued unabated and undiminished, and that there is no evidence to support this assumption.

It is true that some of the witnesses testified that there had been some improvement in the water between the two dates. One of the witnesses, however, testified that it was as bad in the fall of 1928, as it was in the fall of 1925, or perhaps worse. We think this contention is without merit. The fact that the degree of pollution might vary from time to time, dependent upon the season, amount of rainfall, etc., could hardly be said to affect the question one way or another. The evidence as a whole showed that, during all that time, the water in the creek had not been fit to use and had not been used by the city for domestic purposes.

Another so-called element objected to by defendant is that part of the question relative to the pollution of wells along the course of Black Bear creek from a point near Perry, Okla., to a point beyond Skeedee. They do not point out wherein this element was improper. There is evidence from a number of witnesses to show that several wells which had been sunk along the course of the creek near Perry, Okla., to and below the city of Pawnee, some of them 100 feet from the creek and others farther away, ranging up to 40 rods, had become polluted, and the water therein so salty as to render the same unfit for domestic use or for stock water, and that these wells became polluted about the time or shortly after the water in the creek became so salty as to render it unfit for consumption by the citizens or residents of Pawnee, and that they had remained so polluted down to the time of the trial. There was some evidence from which it could be inferred that the wells became polluted by salt water from the creek percolating through the sandy or gravelly strata under the bottom lands between the creek and the wells. The objection to this part of the question is entirely without merit.

In First Nat. Bk. of Hayes City v. Robinson, 93 Kan. 464, 144 Pac. 1019, it was held:

"The modern notion of the admissibility of evidence is that it is more important to get the truth than to quibble over impractical distinctions between facts and conclusions."

We think the rule there announced applicable to some extent to the admissibility of opinion evidence. It is more important to get to the truth than to quibble over impractical distinctions and hair-splitting con-

tentions as to the admissibility of evidence. We think there was no error in admitting the evidence of the witness McMurry as to his opinion on the permanency of the pollution of the water in Black Bear creek. Furthermore, we think there was sufficient evidence aside from the opinion evidence of the witness McMurry to carry the question of the permanency of the pollution of the creek to the jury. As stated before, there are more than 1,000 pages of testimony taken by plaintiff, and as much or more taken by defendant. A large portion thereof went to this controverted question.

The trial court, on its own motion, submitted a special interrogatory to the jury, together with special instruction as to what was meant by the word "permanent" as used in the interrogatory. The interrogatory, instruction, and answer of the jury are as follows:

"Was plaintiff's water supply obtained from Black Bear creek permanently destroyed by reason of the pollution of the water in said creek by salt water and other substances coming from the leases of said defendants, or any of them? And if so, when?

"In this connection, you are told that the word 'permanent,' as above used with reference to the pollution of the water in Black Bear creek, means for such length of·time, as, under all the facts and circumstances here in evidence, would make it reasonable for plaintiff, in the exercise of reasonable diligence and prudence for the welfare of its inhabitants, and with reasonable regard for its duty to minimize its damages, to incur the expense of acquiring and installing a new and permanent system of municipal water supply. Answer: Yes, December, 1925."

By other special interrogatories, the court submitted the question whether or not, by other proposed projects, one on what was called Camp creek, and one by sinking wells, the city of Pawnee could obtain a sufficient quantity of suitable water for its reasonable needs for domestic and commercial purposes. These special interrogatories were answered by the jury in the, negative.

Thus, by the answers to the special interrogatories, the jury specifically found that the plaintiff's water supply obtained from Black Bear creek was permanently destroyed from and after December, 1925, by reason of the pollution of the water in said creek by salt water and other substances coming from the leases of defendants; and that the plaintiff could not obtain a suitable water supply in its stead from either of the two plans or projects alleged by defendants to be as good as, and cheaper than, the proposed Skeedee plan. By these findings we are bound, if there be evidence reasonably tending to support them. We think there is sufficient competent evidence to sustain these findings. Also, we think there is sufficient competent evidence to sustain the special findings of a jury as to the permanency of the destruction of the Black Bear creek water supply.

The next proposition presented is that the trial court erred in giving to the jury instruction No. 15, going to the measure of damages.

The instruction as given is as follows:

"You are further instructed that, if you find the issues in favor of the plaintiff, then you may award to said plaintiff a sum of money by way of damages which will fairly and reasonably compensate said plaintiff. for all the detriment that plaintiff may have sustained as a direct and proximate result of the pollution, if any, of said Black Bear creek by said defendants or either of them.

"In this connection, you are instructed that the measure of damages is the cost of acquiring, installing, and maintaining another adequate and enduring supply of water of a similar unimpaired quality, quantity, and dependability as that of the Black Bear creek, which waters plaintiff would have otherwise enjoyed the use of, but for the alleged pollution of the same by said defendants, in the event you find said waters of said Black Bear creek have become permanently polluted; and the measure of damages also includes whatever expenses you may find have been reasonably and necessarily expended and incurred for a reasonable time by plaintiff in providing water for plaintiff after the alleged pollution of said Black Bear creek, such time being from the time of the discovery by plaintiff of such alleged pollution until the plaintiff should have acquired an adequate and enduring water supply, such time, however, not to be computed beyond the date of the filing of plaintiff's second supplemental petition, to wit, May 10, 1929.

"And, in arriving at the amount, if any, which you will give to said plaintiff, you may take into consideration the cost of acquiring such adequate and enduring water supply from a source other than Black Bear creek, and furnishing water of similar quantity, quality, and accessibility as that which was supplied to said plaintiff prior to the alleged pollution of said Back Bear creek; and you may take into consideration the cost of acquiring the necessary real estate, right of way, cost of construction, installing and maintaining the necessary equipment and machinery in securing such water supply; you may also consider the cost of producing the water from such other source as to whether or not it will exceed the cost of pro-

ducing the water from Black Bear creek prior to said alleged pollution; and you may also consider whether or not the water from such other source will be equal or inferior in quality to the water of said Black Bear creek, and whether the supply from such other source is as dependable and permanent as the supply from said Black Bear creek; and you may also consider the necessary and reasonable expenses incurred for the providing of water to plaintiff for a reasonable time after the discovery of the alleged pollution of Black Bear creek, as shown by the evidence; together with all the other facts and circumstances in evidence, but in no event can such damages exceed the sum of $273,499.61."

All the defendants insist that this instruction is erroneous as not stating the correct measure of damages. The question as to what the correct measure of damages is in the instant case is not without difficulty. Few, if any, precedents can be found bearing directly on the question here involved. Many cases are cited on the question of the measure of damages and questions involving the pollution of streams by draining therein oil, salt water, sewage, and other deleterious substances. No case, however, is cited wherein the pollution of a water supply owned and operated by a city or other municipality was involved. Cases are cited to show the measure of damages to the ordinary landowner occasioned by the pollution of the stream or streams going through or adjacent to their land. In such cases, where the pollution of the stream only is involved, it is generally held that the resulting damages are deemed to be temporary, especially so where the pollution is capable of being abated by the expenditure of labor and money. In such cases, the measure of damages is the decrease in rental value of the premises for the duration of the pollution, and damages may be recovered in successive actions brought within the period of limitation prescribed by law for such actions.

It is contended that only temporary damages are shown by the evidence. This question, we think, is settled adversely to the contention made by the findings and verdict of the jury, but if this were not so, it would be obvious that the rule applied to the ordinary landowner could not be applied here. Municipally owned land, water, and water supply, would have no rental value whatever without a franchise granted by the city in connection therewith by and under which the water rights could be utilized by a private individual or by a corporation. There would be no rule by which the rental value in such cases could be measured. But such is not the case here. Issues were joined upon the permanency of the destruction of the city's water and water supply. The jury by the verdict found that the destruction was permanent. What then is the correct rule as to the measure of damages? Numerous cases are cited, some from this court, and some from other states, stating the rule as to the measure of damages in pollution cases where real property is permanently destroyed or injured by pollution of streams running through the same or adjacent thereto. These, or most of them, are cases where the lands were owned by private individuals. The general rule in such cases seems to be the difference between the market value of the lands or premises immediately before and immediately after the pollution of the streams or destruction or injury of the lands or premises. City of Kingfisher v. Zalabok, 77 Okla. 108, 186 Pac. 936; Oklahoma City v. Stewart, 76 Okla. 211, 184 Pac. 779.

We are asked to hold, as a matter of law, where the alleged pollution consists only of drainage of salt water into streams, that the injury is necessarily temporary, and, therefore, no recovery could he had for permanent injury. This has been held in some cases, and is undoubtedly the general rule where the proof shows the nuisance can be abated by the expenditure of labor and money. This court, in effect, recognized this rule in Union Oil & Mining Co. v. Bowman, 144 Okla. 54, 289 Pac. 296. However, the statement therein on this point was made: "Upon the assumption that the escapement of salt in the stream would terminate at some future time not too remote." By this statement it is intimated that if, under the evidence, it should appear that the pollution was likely to terminate at sometime too remote, the injury might be deemed permanent. If this is the law, it must be for someone, either the court or jury, to determine what period of time would be deemed to be too remote.

In Hollenbeck v. Marion (Iowa) 89 N. W. 210, it was held:

"The measure of damages for the pollution of a stream through a pasture is the difference in the rental value before and after the pollution, and not the reasonable value of procuring water for the stock, the value of the time and trouble in procuring it, or what it would reasonably have cost to furnish an adequate supply of water for the stock."

This, like nearly all such cases, was where the injury was temporary.

City of Lawton v. Johnstone, 92 Okla. 280, 219 Pac. 414, and City of Lawton v. Wilson,

127 Okla. 40, 259 Pac. 650, are cited and relied upon, but they are clearly cases of temporary injury. The fact that in City of Lawton v. Wilson, supra, recovery was denied for an item of $115, for digging a well and building a fence is relied upon to some extent as upholding defendants' contention that the cost of securing another water supply is not the proper measure of damages. But, as stated, that was a case where the plaintiff was suing for temporary injury only, and the proof showed that the nuisance was capable of being abated by the expenditure of labor and money. The digging of the well and building of the fence were held to be permanent improvements for which the plaintiff could not recover in that action. This was proper for the reason that the well and the fence might be presumed to be usable and of value to the farm long after the pollution of the stream had ceased, since the pollution of the stream was temporary in its nature.

But no case where the lands of an individual owner are injured by the pollution of a stream, whether temporary or permanent, would seem to furnish an exact rule for the measure of damages where the municipal water supply is injured by like pollution. If the injury be permanent, as was found by the jury in the instant case, the rule usually applied in cases of permanent injury to the land where owned by an individual would hardly be applicable. The general rule in such cases seems to be the difference in the reasonable market value of the land or premises immediately before and after the pollution. This rule could have no application in cases such as this for the reason that the market value could not be established.

As a general rule, compensation is the relief or remedy provided by the laws of this state for the violation of rights, and the means of securing their observance. Specific and preventive relief may be given in such cases as are specified in the laws. Section 5967, C. O. S. 1921.

Section 5969, C. O. S. 1921, provides:

"Any person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages."

Section 5970, C. O. S. 1921, defines the word "detriment" as a loss or harm suffered in person or property.

Section 577, C. O. S. 1921, provides:

"Whenever damages are recoverable, the plaintiff may claim and recover any rate of damages to which he may be entitled for the cause of action established."

Section 6014, C. O. S. 1921, provides that damages must be reasonable.

The detriment to plaintiff, then, was the loss or harm in property suffered by reason of the destruction of its water supply. This being true, how is the city to be compensated? But for the wrongful acts of defendants, as found by the jury, the plaintiff would have continued to enjoy the rights in, and the use of, the water supply theretofore acquired by it without interruption, but when its supply was thus destroyed, the city and its inhabitants were compelled to look elsewhere for a water supply. The city could not long exist without a supply of wholesome water. The value of the use, or what is usually termed the usable value of its water supply could hardly be measured in dollars and cents. The loss of revenue is suggested as a rule for the measurement of damages, but this would be a single element. Many other things, such as the inconvenience of the residents of the city, menace to the health of the citizens, increased danger of fire, the possible consequent increase in insurance rates, and various other items too numerous to mention, would necessarily enter into any attempt to prove or estimate the usable value of a municipally owned water supply. We do not think it would be proper to measure the damage by the cost of the construction to the city. This would, in many instances, be entirely unfair to one party or the other. Let us say the original cost of the water supply was $50,000, and a new supply could not be obtained for less than $200,000. To fix the damage in such case at the original cost would be inadequate to compensate the city for the loss suffered, and would be unreasonable. On the other hand, let us say that the original cost was $200,000, and a new supply fully as good could be obtained for $50,000. To fix the damage in that case at the original cost would be unfair to the defendants, and result in the payment of a sum greatly in excess of the amount necessary to compensate the plaintiff for its loss.

Defendants Healdton Oil & Gas Company and Oil State Petroleum Company offered an instruction fixing the measure of damages as the difference in the value of the land adjoining said creek, owned by the plaintiff, and its water rights prior to and after such permanent pollution, and based one of their specifications of error upon the refusal to give this instruction. In support of this specification, they cite cases holding the

measure of damages for the permanent injury of real property to be the difference in the market value of the property before and after the injury.

We think we have shown that this rule is not capable of practical application in cases of the kind here under consideration.

It must be conceded that plaintiff was entitled, under the law, to just compensation for the detriment suffered. No better rule than that adopted and applied by the trial court for measuring the damages has been suggested, and we know of none. Counsel for the four defendants who appeal separately never at any time during the course of the trial, which consumed nearly three weeks' time, and the record of which contains nearly 3,000 pages of typewritten matter and exhibits, suggested to the trial court what they thought the true measure of damages to be in the case. Many able and experienced attorneys are on the briefs for these companies, but they do not in their briefs give this court the benefit of their judgment and experience as to what the correct rule is. They content themselves by saying that the rule adopted by the trial court is incorrect and erroneous.

Defendants complain at length because the court included the cost of maintaining another adequate and enduring supply of water, etc. We find no fault with this when we consider that the two plans other than the one contended for by the plaintiff as to the best and cheapest and most practical and dependable as a source of water supply, were under consideration. These two, known as the Camp creek project and the well project, under the evidence, would necessarily cost considerable sums to maintain. There is no evidence whatever as to the cost of the maintenance of the water supply as it existed before the pollution, nor is there any evidence as to the cost of maintenance of the supply proposed to be acquired by plaintiff known as the Skeedee creek project. The record discloses that it would necessarily cost considerable sums of money to maintain either of the two supplies, which defendants contended could be acquired at less cost than the one contended for by plaintiff. The jury had all three of these plans, their probable cost and necessarily the cost of maintaining the "well project" or the "Camp creek project." These matters were all for the consideration of the jury in determining the amount necessary to compensate the plaintiff for the detriment complained of.

It is contended that plaintiff's attorney argued the item of maintenance as an element of damages. The argument of plaintiff's attorney is in the record and shows for itself, that, wherever maintenance is used in his argument, it has reference to the cost of maintenance of one or the other of the two projects contended for by defendants as being cheaper and just as good.

The four defendants joined as plaintiffs in error also contend that the court erred in giving instruction No. 9, defining the word "permanent" as used in the instructions in reference to the pollution of the water in Black Bear creek. The instruction as given is:

"The court instructs the jury that the word 'permanent,' as used in these instructions with reference to the pollution of the water in Black Bear creek, means for such length of time as, under all the facts and circumstances here in evidence, would make it reasonable for plaintiff, in the exercise of reasonable diligence and prudence, for the welfare of its inhabitants, and with reasonable regard for its duty to minimize its damages, to incur the expense of acquiring and installing a new and permanent system of municipal water supply."

Said defendants are in no position to complain of this instruction. It is identical with instruction No. 10, offered by them. True, they asked leave to withdraw their offered instruction, but this was not until the court had prepared tentative instructions including instruction No. 9, as given, and submitted them to counsel for inspection and suggestions. The practice of requesting instructions and withdrawing the request after the court has adopted the instruction and indicated its intention to give it, and then excepting thereto, cannot be sanctioned by this court. It would, in many cases, lead to confusion and invite error, and permit the party thus inviting the error to take advantage thereof. The same definition was given in submitting the special interrogatory No. 1, above quoted, and was not excepted to.

We think it a fair definition of the word "permanent," as used in the instructions and the pleadings in the case.

Objection is next made to instruction No. 12, given by the court, principally upon the ground that it omitted to tell the jury that, in the event the pollution of Black Bear creek could be abated by the expenditure of labor and money, plaintiff could not recover for the cost of acquiring and installing a new permanent water supply. The same objection was included in the objection to instruction No. 9, supra.

This question was fully covered by instruction No. 10, as given, wherein the jury was plainly told that, if it should find from the evidence that the pollution had been or could be abated by the expenditure of labor and money, or by process of nature within a reasonable time, plaintiff was not entitled to recover the cost and expense of acquiring and installing a new permanent water supply.

The instructions are to be read as a whole, and when so read the omission complained of does not appear. The same may be said as to the objection to instruction No. 11. We do not regard it as necessary to repeat in every paragraph of the instructions the simple statement to the jury that the plaintiff was not entitled to recover for the cost and expense of acquiring a new permanent water supply unless the injury to the water supply owned by it was permanent. Such repetition tends to confuse rather than enlighten the jury.

Finally, defendants complain of instruction No. 16, which told the jury that the $40,000, theretofore paid to the city by certain of the defendants, should be deducted, and by it the jury was instructed to deduct said sum from any sum or sums, if any, that should be found due to the plaintiff. Clearly, under the contract, defendants were entitled to the credit of this $40,000. Defendants contend that the jury should have been instructed to find the total amount of plaintiff's damages and return a verdict accordingly, and that the court should have deducted the $40,000 from the amount of the verdict in entering its judgment. In view of the fact that the payment of the $40,000, under the contract pleaded, was constantly before the jury and frequently called to their attention during the course of the trial, it was entirely proper for the court to instruct the deduction of said sum by the jury. Otherwise, the jury, without such instruction, might have considered it their duty to deduct it, and so done, and if the court could have deducted the same sum from the verdict, defendants would have twice had the benefit of the deductions. In fairness to all parties, we think it was proper for the jury to make this deduction.

It is asserted under assignments 1, 2, 3, 6, 7, 8, and 9 that the court erred in overruling the separate demurrers of defendants to plaintiff's petition. If there be merit in this contention, probably not all of the four defendants joining in the petition in error are entitled to raise that question here. These four defendants saw fit to file separate motions for a new trial. At least one of them failed to present this question to the trial court in its motion for a new trial. However, we have fully considered the assignments and what has been said in support thereof, and conclude that the demurrers were properly overruled.

The defendants Healdton Oil & Gas Company and Oil State Petroleum Company assert error in overruling their motion for judgment on the special findings of fact made by the jury, notwithstanding the general verdict against them. They assert that, under the finding of the jury in its answer to special interrogatory No. 1, the plaintiff's water supply was permanently destroyed by reason of the pollution of the water in Black Bear creek by salt water and other substances from the leases of defendants, and that this occurred in December, 1925. It is contended that the only evidence tending to show that these two defendants permitted salt water to escape from the lease operated by them was as of a time subsequent to December, 1925, and that even this water was not traced into Black Bear creek. The evidence offered by plaintiff as to the escape of salt water from the lease operated by these two defendants was relative to a time subsequent to December, 1925. We think, from the evidence given as to the nature of the structures maintained by such defendants, the jury might reasonably have inferred that the condition testified to had existed for such length of time as to take it back of December, 1925. However, these two defendants did not see fit to stand upon their demurrer to plaintiff's evidence, and thereafter introduced evidence from which the jury could reasonably infer that the conditions did exist prior to December, 1925. It cannot be said that there was no evidence whatever reasonably tending to connect these two defendants with the pollution of the creek prior to December, 1925.

The motion was properly overruled. This, we think, disposes of all the questions raised by all the defendants against whom the verdict was rendered and judgment entered. The case, we think as a whole, is remarkably free from error considering the length of the record, the time consumed in the trial, and the zeal displayed by the several learned attorneys for the defense. No possible chance seems to have been overlooked by them to object and save their exceptions during the progress of the trial.

There being no substantial error in the record, the judgment is hereby affirmed.

LESTER, C. J., CLARK, V. C. J., and

CULLISON and KORNEGAY, JJ., concur. ANDREWS, J., dissents. HEFNER and SWINDALL, JJ., not participating.