## ARKANSAS FUEL OIL CO. v. CITY OF BLACKWELL.
### No. 1436.

Circuit Court of Appeals, Tenth Circuit.
Dec. 11, 1936.

Samuel N. Hawkes and Frank H. Bacon, both of Bartlesville, Okl. (James W. Finley, of Bartlesville, Okl., on the brief), for appellant:

Roy W. Cox and Howard F. Wilson, both of Blackwell, Okl., for appellee.

Before PHILLIPS, McDERMOTT, and BRATTON, Circuit Judges.

McDERMOTT, Circuit Judge.

In a jury-waived case, the City of Blackwell recovered a judgment for $15,000 on account of the pollution of the Chikaskia River which destroyed its water supply. Appellant and several other oil companies in 1925 and 1926 brought in numerous oil wells in the Otstot Field; much salt water was produced which was stored in ponds from which it seeped into the river above the waterworks. The bill of exceptions recites that it was proven by undisputed evidence that "The water supply of the city, being the Chikaskia River above the dam referred to, became contaminated by salt water from the operations in the Otstot Field."

The City was compelled to and did build a new waterworks above the oil field and sued the oil companies for the damage caused by their acts in destroying the water supply. The companies other than appellant settled the case for $70,000, the settlement taking the form of a covenant not to sue with a clear reservation of the right to sue appellant for the joint tort.[1] Credit was given on the damages for the $70,000 received. Appellant assigns several errors.

1. *That there was no competent evidence that appellant polluted the river.* Appellant operated two leases in this field from 1925 to 1931. It is conceded that the water supply was contaminated by operations in this field. Appellant stored salt water in ponds, drilled holes in the bottom of the ponds and later dynamited them so that the salt water could escape. It showed up later in the river. The escaping salt water went somewhere; it did not run uphill; it went to the river of course, for there was nowhere else it could go; its presence in the river opposite this field, and not higher up, demonstrates conclusively that it came from this field. No one saw the water as it percolated through the sands, but that is not necessary.

The proof that it destroyed the water supply is complete, uncontradicted, and corroborated by the fact that a new plant was necessary and has been built. Since appellant contributed to the contamination, it makes no difference whether salt water escaped from one or both its leases; however both leases produced salt water; there was no place for it to escape except to the river, there being no suggestion that it was carted or piped off the premises.

Appellant disposed of its leases in 1931 to a tool company which ceased operations within five days, plugged the wells and removed the equipment. Appellant suggests the salt water may have come from the wells after that because of defective plugging. But the evidence discloses that salt water seeping into the soil will pollute a stream for years, some of the salt depositing in the sub-surface water sands, to remain until carried on in wet seasons when the sands are saturated. Having deliberately impregnated the sub-soil with salt water for five years, and the proof showing that it may take years for it to reach

[1] Such settlement did not release appellant. Greenhalch v. Shell Oil Co. (C. C.A. 10) 78 F.(2d) 942, 944; Carey v. Bilby (C.C.A. 8) 129 F. 203, 206.

the river, no objectionable speculation inheres in the finding that appellant joined in destroying appellee's water supply.

Nor is the contention tenable that the supply is unfit for use during a few months of the year only. A water supply is either constant or worthless. If the City of Blackwell were left without water for a month a year, its people would be at the mercy of fires and pestilence. As to the contention that the proof does not affirmatively show a wholesome water supply before the pollution, it is enough to say that for 35 years the City procured its supply from this river.

■ The trial court's finding that appellant joined in destroying appellee's water supply is in accord with the evidence, natural laws, and common sense. For the damage done, it should pay. Okl.Stat.1931, § 6071; Kewanee Oil & Gas Co. v. Mosshamer (C.C.A. 10) 58 F.(2d) 711.

■ 2. *That the statute of limitations bars recovery.* Section 6071, Okl.Stat.1931, enacts the common law rule that it is unlawful for any person so to pollute the water supply of a city as to render it unfit for municipal purposes. Section 6072 provides that if the pollution continue for six months or more, the injury shall be regarded as permanent, and authorizes the city to sue and recover compensatory damage. There was such continued pollution here. Aside from the statute an injury is permanent when its cause cannot be abated by reasonable expenditure. Atchison, T. & S. F. Ry. Co. v. Eldridge, 41 Okl. 463, 139 P. 254; Union Oil & Mining Co. v. Bowman, 144 Okl. 54, 289 P. 296; Commercial Drilling Co. v. Kennedy, 172 Okl. 475, 45 P.(2d) 534. When salt water is introduced into the sands of the earth the condition is beyond repair and the injury is permanent.

■ The governing statute of limitations is two years. Subdivision 3, § 101, Okl. Stat.1931. When does it begin to run? The answer will be found in the Oklahoma decisions, and not those of other states cited by appellant, for limitation of actions is purely statutory, and the Oklahoma statutes mean what the Supreme Court of Oklahoma says they mean. The Oklahoma decisions are clear. In Commercial Drilling Co. v. Kennedy, 172 Okl. 475, 45 P.(2d) 534, 535, the Supreme Court said:

"In an action for damages for permanent injury to real estate caused by continuing salt water pollution, the statute of limitations begins to run at the time it becomes obvious that a permanent injury has been suffered."

To the same effect are City of Tulsa v. Grier, 114 Okl. 93, 243 P. 753; City of Lawton v. Wilson, 127 Okl. 40, 259 P. 650; Richards v. Flight, 97 Okl. 9, 222 P. 564; City of Tulsa v. Springfield Life Ins. Co., 157 Okl. 218, 11 P.(2d) 493; Indian Territory Illuminating Oil Co. v. Klaffke (Okl. Sup.) 61 P.(2d) 669.

Under the Oklahoma statute, then, the cause of action accrued when it became obvious to the City that it had suffered permanent injury, that is, to use the language of section 6071 of the statutes, when its water supply was rendered unfit for use. When that was is purely a question of fact. Upon ample and largely uncontradicted proof, the court found that date to be within two years of the filing of this action. Even were we so inclined, which we are not, we are without power to substitute our opinion on a disputed question of fact for that of the trier of the facts in a law action. "There shall be no reversal in * * * a circuit court of appeals * * * for any error in fact." 28 U.S. C.A. § 879.

■ Appellant's argument is that since it produced and stored salt water from 1926 on, the cause of action arose before February 25, 1931, that is, more than two years before this suit was filed. But the critical time, according to the Oklahoma law, is not when salt water was run into the ponds, or even into the sands, or even into the river; the critical date was when the City learned that the salt had reached the river in such quantities as permanently to ruin its water supply. Appellant relies upon statements of witnesses that the sands were porous, and the water got away "rapidly * * * pretty fast * * * in a hurry." But these are relative terms. Considering the sands of the South Canadian, where salt water runs three inches in two years, or in the coarse sands of Holdenville, where it runs six inches in two years, the engineers' estimate of five feet a day movement here is very rapid. But these speculations are of no avail against the positive evidence that this salt water in

fact reached the river in deleterious quantities in the summer of 1932 or later.

3. *Proof of damages. Location of new plant.* The City built a new dam and power house about two miles above the oil field, at a point where the pump house could be built upon high banks and on the same side of the river as the city. It ran its pipe line down the highway and railroad right of way to the city, at no cost for right of way. Appellant contends it should have constructed its dam and pump house at a point two miles closer to the city, and on the far side of the river from town.

The city may not arbitrarily build a new plant at extreme distances from the city and charge the cost thereof to appellant. On the other hand, the responsibility of so locating the new plant that an uninterrupted supply of wholesome water will be available to its citizens is vested with the city authorities and not with the tort-feasor which destroys its present supply. A heavy burden rests upon the wrongdoer to show by clear and convincing proof that the city authorities acted arbitrarily in deciding the important question of the location of the new plant. The responsibility of the court ends when it decides whether the wrongdoer has carried this burden. The trial court held appellant did not establish arbitrary action; and we concur entirely with that finding. Two reasons alone condemn the site selected by appellant as a substitute for the location selected by the city authorities. First, it is below a creek which empties into the Chikaskia and which drains a part of the Otstot Field. Since salt water, once in the sands, will pollute for years to come, it would be absurd to build a dam where the supply is subject to pollution. Second, appellant's suggested site would put the pump house across the river from town, where the bank is four feet under water at flood, and which in flood seasons could only be precariously reached by boats; further, the pipe carrying the water for the entire city must cross the river on an existing bridge, and we are not advised whether that involves a hazard to a constant supply in times of flood. We agree with the city authorities that the pump house should be, if reasonably possible, on the same side of the river as the town and above the flood level, so that it is readily accessible for repairs even in flood times.

It is then contended that the pipe line should have been built directly across country to town, instead of following the highway south, thence at a right angle to town, thus saving about one and one-half miles of pipe. But there are other factors. Cutting across lots would have brought it through the oil field, with rights of way to purchase from lessors and lessees; damages to be paid for interfering with derricks, tanks, gathering lines, etc. There was no cost for right of way on the route selected. For aught the proof shows—and the burden is on appellant—following the highway and railroad may have put this vital line on higher and safer ground than the diagonal; it may be that the diagonal line would cross creeks and draws which must be bridged, or cross on lower ground subject to overflow. It was the responsibility of the city authorities to assure the people a dependable supply of water, and many factors enter into the equation other than the first cost. All appellant proved was that a plant at another site would involve a smaller initial outlay; its proof does not attempt to cover the more important matters of constancy of supply, cost of upkeep, etc. Such proof does not justify a court in substituting its judgment for that of the city authorities.

*The cost of the new plant.* The measure of damage where a city's water supply has been destroyed is laid down in Roxana Petroleum Corporation v. City of Pawnee, 155 Okl. 141, 7 P.(2d) 663, as follows:

"In such case the proper measure of damages is the cost of acquiring and installing another adequate and enduring supply of water of a similar quality, quantity, and dependability as that which the city owned and used prior to the pollution thereof, * * * and also cost of maintaining such new supply in case the acquisition of a new supply requires the adoption of a plan necessarily more expensive to deliver the water to the point or place at which the original supply was obtained, if necessary so to do."

But the "cost" referred to is the ordinary cost on the open market of constructing the plant, provable by contractors or others conversant with construction costs. Appellee did not so proceed; instead it proved that the new plant cost the city $160,237.52 in addition to requiring an at-

tendant at the plant, at a cost of $900 a year, which was not necessary at the old plant at the city limits. Conceding that ordinarily cost in an arm's length bona fide transaction is some evidence of value, Kitrell v. United States (C.C.A. 10) 79 F. (2d) 259, it appears here that the cost was materially increased by using hand labor instead of machinery. The government contributed $29,000, doubtless as an inducement to use hand labor, which appellee willingly credits on the damage; the trouble is we have no way of knowing whether that sum even approximates the additional cost incident to the use of hand labor and complying with other federal regulations. Appellee offered no proof as to the reasonable cost of constructing the plant in the ordinary way with the use of machinery.

However, such proof was supplied by appellant's witnesses. Its engineers computed the cost at the site selected by it at $52,044, of which $16,117 was for pump house and dam, leaving $35,927 for 12,000 feet of pipe, or a cost of $15,840 a mile. Using this figure on the 6 miles to the location used, the cost amounts to just over $95,000. Add to that the cost of the dam and pump house at appellant's figures of $16,000, and of the pumper's house at $2,500, we have a figure of $113,500. To that should be added the cost of a pumper at the plant at $900 a year, which, at 6 per cent. interest, would add $15,000 to the damage. This brings a minimum figure of $128,500. Other companies paid $70,000.

It thus appears that the damage is $58,500, or if the expense of greater operating cost is excluded, $43,500. The judgment was for $15,000, a figure which seems to have been arrived at without reference to the evidence.

We have considered remanding the case for a finding on damage in accord with the proof. But there are difficulties in the way. Appellant manifestly has no reason to complain of an award which is only a part of the damage it inflicted; as to it, the error is harmless, to say the least. Appellee does not complain. Moreover, an appellate court's power on a finding of the amount of unliquidated damage is closely confined. Fairmount Glass Works v. Coal Co., 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439.

The judgment is affirmed.