**Robert C. O'NEAL, Individually and as Representative of the Estate of Florence M. O'Neal, Decedent; Jeff O'Neal; Scott R. O'Neal; James Hamacher; Mary Jean Hamacher; David B. Hamacher; John T. O'Donnell; Vivian J. O'Donnell; John T. O'Donnell, II; Drusanne O'Donnell; Katie O'Donnell, a Minor, by John T. and Drusanne O'Donnell, her Parents and Guardians; Eileen S. Kroh; Dana J. Miller, a Minor, by Eileen S. Kroh, her Parent and Guardian; Philip P. Riedel;**

**Kerper W. Riedel; Theodore P. Riedel; Christina Riedel, a Minor, by Philip P. and Kerper W. Riedel, her Parents and Guardians; William B. Whittock; Irene E. Whittock; Susan Whittock; All Plaintiffs, Plaintiffs,**

**v.**

**DEPARTMENT OF the ARMY of the United States of America; United States of America; All Defendants, Defendants.**

**Civ. A. No. 1:CV–90–1073.**

United States District Court,
M.D. Pennsylvania.

May 16, 1994.

See also 801 F.Supp. 1432.

---

Marvin Beshore, Laurence W. Dague, Glenn R. Davis, Raja G. Rajan, Shumaker Williams, P.C., Harrisburg, Pa, for Robert C. O'Neal, Jeff O'Neal, Scott R. O'Neal, James Hamacher, Mary Jean Hamacher, David B. Hamacher, John T. O'Donnell, Vivian J. O'Donnell, Drusanne O'Donnell, Eileen S. Kroh, Dana J. Miller, Phillip P. Riedel, Kerper W. Riedel, Christina Riedel, William B. Whittock, Irene E. Whittock and Susan Whittock.

Laurence W. Dague, Glenn R. Davis, Raja G. Rajan, Shumaker & Williams, P.C., Harrisburg, PA, for Katie O'Donnell.

Raja G. Rajan, Shumaker & Williams, P.C., Harrisburg, PA, for Theodore P. Riedel.

Richard W. Sponseller, U.S. Attys. Office, Harrisburg, PA, Leslie Yu, Wendy L. Weiss, Torts Branch, Civil Div., U.S. Dept. of Justice, Margaret Jane Mahoney, Stuart M. Gerson, U.S. Dept. of Justice, Civil Div., J. Pat-

rick Glynn, Wagner Jackson, U.S. Dept. of Justice, Torts Branch, Civil Div., Washington, DC, for Dept. of Army.

Kim Douglas Daniel, U.S. Attys. Office, Richard W. Sponseller, U.S. Attys. Office, Harrisburg, PA, Robert Lefevre, U.S. Dept. of Justice, Leslie Yu, Wendy L. Weiss, Torts Branch, Civil Div., U.S. Dept. of Justice, Brett P. Scott, Margaret Jane Mahoney, U.S. Dept. of Justice, Stuart M. Gerson, U.S. Dept. of Justice, Civil Div., J. Patrick Glynn, Wagner Jackson, U.S. Dept. of Justice, Torts Branch, Civil Div., Washington, DC, for U.S.

CALDWELL, District Judge.

Trial in this case was held February 1–4, 1994, and we now issue our findings of fact and conclusions of law, and render a verdict and judgment.

### FINDINGS OF FACT

*Factual Background*

1. Test Plaintiffs, Robert O'Neal, Mary Jean Hamacher, Vivian O'Donnell, and Christina Reidel currently live or formerly lived in homes in a development known as Westfield Terrace, which is located in York County, Pennsylvania, adjacent to the former New Cumberland Army Depot ("NCAD," now known as Defense Distribution Region East "DDRE").[1] Appendix A shows the locations of the homes and NCAD.

2. Each of the four homes had private wells and the residents of each home used well water for virtually all activities, including cooking, drinking, bathing, laundry, gardening, and car-washing. *See* Testimony of Mary Jean Hamacher (hereafter "Hamacher Testimony"); Testimony of Vivian O'Donnell (hereafter "V. O'Donnell Testimony"); Testimony of Robert O'Neal (hereafter "O'Neal Testimony"); Testimony of Christina Riedel (hereafter "C. Riedel Testimony").

3. The United States Army began construction of what came to be called NCAD in 1917. From approximately 1960 to 1983, the NCAD served as an aircraft maintenance facility, primarily for U.S. Army helicopters. Report of the U.S. Army Toxic and Hazard-

ous Materials Agency (hereafter "USATHA-MA Report") at 1–7, 1–8.

4. The part of the NCAD at issue in this case was known as the Aircraft Maintenance Area (hereafter "AMA"). It covered 127 acres and included Warehouses 7, 8, 9, and 10 and Hangars 87, 88, and 92. USATHA-MA Report at 1–9. *See* Appendix A.

5. Operations in Warehouse 7 including cleaning and plating of aircraft parts. Workers removed grease from parts using a vapor degreaser that utilized trichloroethylene (hereafter "TCE"). Any spills were collected by a floor drain. USATHAMA Report at 1–9; Testimony of Larry Neidlinger (hereafter "Neidlinger Testimony").

6. Plating operations in Warehouse 7 required the use of a chromic acid plating solution. Spills from this operation were collected by floor drains. USATHAMA Report at 1–11; Neidlinger Testimony.

7. Workers in Hangar 87 cleaned aircraft frames, often stripping all of the paint from the metal. Various chemicals were used, including aromatics, ketone, chlorinated carbons, and heterocyclics. USATHAMA Report at 1–11.

8. Workers in Hangar 92 primarily painted aircraft frames. The paints contained zinc, chromium, and lead. USATHAMA Report at 1–12.

9. Until 1974, the drains in Warehouse 7 were connected to a series of terra cotta pipes that lead to a corrugated metal pipe. That pipe, in turn, lead to an open channel that emptied into the Marsh Run Pond south of the AMA. Testimony of Peter Robelen (hereafter "Robelen Testimony"). *See* Appendix A.

10. In 1974, the drainage system was connected to a treatment plant and no longer emptied into the open channel. Robelen Testimony.

11. In 1985, workers demolishing Warehouse 7 found a chromium sump under the former plating shop. The sump collected spillage and overflow from the plating tank.

---

**1.** Those findings of fact that are unattributed to portions of the record are undisputed. *See* Plain-

tiffs' and Defendants' Proposed Findings of Fact and Conclusions of Law.

When found, it was "severely degraded" by the acidic plating solutions it had once collected. USATHAMA Report at 1–12.

12. Excavation personnel had the sump removed and tested a yellow-orange liquid that had leached from it, discovering the liquid to contain high concentrations of chromium. NCAD officials notified the Pennsylvania Department of Environmental Resources (hereafter "PADER") and the United States Environmental Protection Agency (hereafter "EPA"). USATHAMA Report at 1–13.

13. Four test pits were dug in the ground surrounding the sump. Testing from those pits indicated that chromium had migrated through the ground. With PADER approval, the Army removed much of the soil surrounding the sump and disposed of it. USATHAMA Report at 1–13.

14. In late 1986, the Army tested the groundwater around the site by use of monitoring wells. Those wells revealed that the groundwater contained levels of chromium ranging from less than .02 milligrams per liter to 41.4 milligrams per liter. USATHAMA Report at 1–13.

15. In July, 1988, six more groundwater monitoring wells were installed around the site and testing of water from four of them showed levels of TCE from 184 to 488 parts per billion (hereafter "ppb"). Analysts did not test for the presence of chromium at that time. USATHAMA Report at 1–15.

16. Upon receiving those test results, the Army canvassed the neighborhood surrounding NCAD, and discovered that the four homes in which the test Plaintiffs lived were the only ones with private wells. The remaining homes received municipal water. Neidlinger Testimony.

17. The Army and PADER tested the wells and determined the following chemicals to be present at the following levels (where more than one number is noted, more than one test was performed): [2]

O'Neal Well

| TCE | 750, 660, 11 ppb |
|---|---|
| Chromium | 240 ppb |
| Barium | 40,000 ppb |
| 1,2 Dichloroethane | 3.8 ppb |

Riedel Well

| TCE | 1,100, 1,350 ppb |
|---|---|
| Chromium | 234 ppb |
| Barium | 32,000 ppb |
| Arsenic | 3.2 ppb |
| 1,1 Dichloroethene | 1 ppb |
| 1,2 Dichloroethane | 8.5 ppb |

O'Donnell Well

| TCE | 860, 1,000 ppb |
|---|---|
| Chromium | 195 ppb |
| Barium | 30,000 ppb |
| 1,2 Dichloroethane | 6.2 ppb |
| 1,1,1 Trichloroethane | 2.3 ppb |

Hamacher Well

| TCE | 5.7, 9.2 ppb |
|---|---|
| Chromium | 221 ppb |
| 1,1 Dichloroethene | 13, 16 ppb |
| 1,1 Dichloroethane | 1.1 ppb |
| 1,1,1 Trichloroethane | 10, 12 ppb |

18. Immediately upon detecting contamination of the private wells, the Army placed notices on the doors of the four (O'Neal, Reidel, O'Donnell, and Hamacher) homes informing the residents not to use their well water. Neidlinger Testimony; Hamacher Testimony; V. O'Donnell Testimony; O'Neal Testimony.

19. The Army immediately provided bottled water to the residents and, within two months, paid for the four residences to be connected to the municipal water main. Since the time of the discovery, none of the Plaintiffs have used water from the wells. Undisputed; Hamacher Testimony.

20. Test Plaintiff Mary Jean Hamacher felt "concern" at hearing of the contamination. Since that time, she has occasionally lost sleep and wondered what effect the contamination might have on her and her family. However, she has not sought counseling for emotional distress and she has worried less about health effects from the contamination since her blood was tested for TCE in 1989

**2.** It is undisputed that chemicals other than those described here were found. We limit our lists to those about which testimony primarily focused.

and found to be negative. Hamacher Testimony.

21. Test Plaintiff Vivian O'Donnell was "very upset" when she learned of the contamination. She worries whenever any member of her family becomes ill that there is some connection to the contaminated well water. She is often short-tempered and attributes that to the water situation. Additionally, she has lost sleep and worries about what effect the contamination will have on her children and grandchildren. However, she has not sought counseling for emotional distress and has joked with colleagues at work about the contamination. V. O'Donnell Testimony.

22. Test Plaintiff Robert O'Neal was "terrified and petrified" when he saw the notice of contamination. He worried that he might get cancer, the disease from which his wife died. He has concerns about the future and has not had a full night's sleep since August, 1988. O'Neal Testimony.

23. Test Plaintiff Christina Riedel was "scared" and "shocked" that she had used the contaminated water for a period of time. She worried about her health and that of any children she may have. Ms. Riedel had difficulty sleeping just after learning of the contamination. However, she had sleep difficulties before the contamination was discovered. She has not sought counseling for emotional distress and leads a normal life as a student at the Indiana University of Pennsylvania.

*Evidence of Negligence*

24. Use of TCE in vapor degreasers at NCAD between 1960 and 1980 was in accordance with industry standards at the time. The method by which TCE was used at NCAD during that time was also in accordance with industry standards. Testimony of Roger Minear, Ph.D (hereafter "Minear Testimony").

25. The use of terra cotta pipes in the drainage system at NCAD was in accordance with industry standards of the time. Minear Testimony.

26. A 1969 study of the NCAD AMA by the U.S. Army Environmental Hygiene Agency determined that the discharge of waste into the on-base lake formed by the Marsh Run Creek violated several Pennsylvania environmental laws. Further, the study recommended that the waste be channeled to a treatment facility. Special Study of Industrial Wastes Survey No. 24–006–69/70, New Cumberland Army Depot, New Cumberland, Pennsylvania, 27 October—7 November 1969, U.S. Army Environmental Hygiene Agency (hereafter "1969 USAEHA Report").

27. A 1972 study by the U.S. Army Environmental Hygiene Agency concluded that NCAD discharges to the Marsh Run Creek were having a significant and negative effect on the aquatic life of the creek. The effect was limited to the part of the creek within the confines of the NCAD and there was no evidence of a similar effect on the Susquehanna River, into which the Marsh Run Creek flows near the NCAD. The study recommended that further studies be done and that waste water be channeled to a treatment facility rather than the creek. Water Quality Biological Study No. 24–017–73, A Biological Assessment of the Surface Waters Associated with the New Cumberland Army Depot, New Cumberland, Pennsylvania, 18 October—20 November 1972, U.S. Army Environmental Hygiene Agency (hereafter "1972 USAEHA Report").[3]

---

3. Plaintiffs offer several proposed findings of fact related to a leak of chemicals from Tank 950 on the NCAD. *See* Plaintiffs' Revised Proposed Findings of Fact and Conclusions of Law Nos. 84–89. We do not discuss this evidence, or several other alleged instances of environmental problems at the NCAD because Plaintiffs' hydrogeologic expert, Mr. Robelen, testified that the Tank 950 spill did not contribute to Plaintiffs' well contamination. Robelen Testimony. Indeed, Mr. Robelen pointed almost exclusively to operations at Warehouse 7 and Hangars 87 and 92 as possible sources for the well contamina-tion. *Id;* Appendix A (Appendix A is a map prepared by Mr. Robelen. The arrows indicate the direction in which he testified the groundwater flows); *see also,* Testimony of Marilyn Hewitt (hereafter "Hewitt Testimony") (testifying that all other sites are hydrogeologically isolated from Plaintiffs' homes). Thus, we deem relevant only evidence regarding activities in those areas and, accordingly, do not consider several of Plaintiffs' proposed findings of fact. *See, e.g.,* Plaintiffs' Revised Proposed Findings of Fact and Conclusions of Law Nos. 90–101.

*Evidence of Migration*

28. Because of the hydrogeologic structure of the area surrounding the AMA, groundwater flows in a south-southwesterly direction. Thus, most groundwater moving under the AMA empties into the Marsh Run Creek and is eventually discharged into the Susquehanna River to the east of Plaintiffs' homes. Hewitt Testimony; Government Exh. 43 (Appendix B to these Findings of Fact).

29. Because of the hydrogeologic structure on which NCAD sits, the open channel and the corrugated metal pipe that empties into it (*see* Finding of Fact No. 9) are isolated from Plaintiffs' wells such that they are not the source of the well contamination, because groundwater from that area would not travel in the direction of Plaintiffs' homes. Hewitt Testimony; Government Exh. 43 (Appendix B) (Appendix B is a map prepared by Ms. Hewitt. The arrows show in which directions she testified the groundwater flows. The triangles represent the Plaintiffs' homes).

30. There is no site near Plaintiffs' residences that could likely be the source of the well contamination other than the NCAD. While certain of the chemicals are used at the nearby Capital City Airport, the area in which they are used is significantly remote from Plaintiffs' homes and could not be a source of the contamination. Robelen Testimony.

31. Given the direction of groundwater flow, the area in which the chromium sump was discovered under Warehouse 7 is the likely source of the contamination of Plaintiffs' wells. Hewitt Testimony; Robelen Testimony (indicating that the area of the chromium sump was one likely source); Government Exh. 43 (Appendix B).

*Medical Monitoring*

32. The test Plaintiffs drank and otherwise used water from the contaminated wells for an undetermined number of years. Undisputed.[4]

33. The test Plaintiffs were exposed to the chemicals found in the wells in significant ways including, *inter alia*, drinking, cooking, and bathing for at least several years.

34. Plaintiffs' risk assessment expert, Richard Greeley, Ph.D, testified that Plaintiffs suffer a significantly greater risk of contracting cancer and other diseases because of their exposure. Testimony of Richard Greeley, Ph.D (hereafter "Greeley Testimony").

35. Dr. Greeley's conclusions overstate the risk because of a number of erroneous assumptions in his study, including the following:

A. that TCE is definitely a human carcinogen. The federal Environmental Protection Agency (hereafter "EPA") has determined that TCE is a *likely* carcinogen.

B. that the appropriate risk figures are the EPA's upper-bound estimates. While appropriate for regulatory purposes in which the goal is to be particularly cautious, the upper-bound estimates overstate the *actual* risk and, so, are inappropriate for use in determining whether medical monitoring should be instituted.

C. that Plaintiffs were drinking the well water for 26 years when even Plaintiffs' expert, Mr. Robelen, testified that the earliest the contaminants could have reached the wells was 1967 (thus, the maximum time possible was 21 years).

Testimony of Martyn Smith, Ph.D (hereafter "Smith Testimony"); Greeley Testimony (confirming that certain assumptions were made).

36. Because of their exposure, Plaintiffs actually face an increased risk of cancer of between zero and one in 1,000,000. Smith Testimony.

37. Even using Dr. Greeley's estimate, Plaintiffs' face an increased risk of contracting cancer of approximately three in 10,000, or .03 per cent. Greeley Testimony.

---

4. Plaintiffs' expert Mr. Robelen testified that it would have taken the chemicals three to seven years to migrate from the open ditch to Plaintiffs' wells. As we have found that the open ditch was not the source of contamination, that estimate is of no moment. It is evident, however, that the well water was contaminated for some time; the leaking chromium sump was found seriously degraded in 1985, thus suggesting that it had been leaking for some time before that.

38. Without regard to toxic exposure, a person has a 25 per cent chance of contracting cancer during his lifetime. Smith Testimony.

39. Employing Dr. Greeley's estimate, Plaintiffs' lifetime risk of contracting cancer increased because of their well-water exposure from 25 per cent to 25.03 per cent. Smith Testimony; Greeley Testimony.

40. Employing Dr. Smith's estimate, Plaintiffs' risk of contracting cancer because of their well-water exposure increased by approximately the same amount as if, for instance, they had each smoked seven packs of cigarettes, lived in New York City or Boston for 200 days or driven 500 miles each year. Smith Testimony.

41. Several of the chemicals in Plaintiffs' wells may cause non-cancerous diseases, although the risk was not quantified at trial. Testimony of Susan Daum, M.D. (hereafter "Daum Testimony").

42. It is preferable in medical monitoring to identify a particular organ or body structure most at risk of disease so that testing may be targeted appropriately. Testimony of Jessica Herzstein, M.D. (hereafter "Herzstein Testimony").

43. Plaintiffs' expert, Dr. Susan Daum, testified that Plaintiffs suffer an increased risk of contracting disease and that this increased risk makes medical monitoring appropriate. Her assessment of the risk is based on Dr. Greeley's risk assessment which, as noted, overstates the risk because of various false assumptions. Daum Testimony.

*Property Damage*

44. The four homes at issue in this case are now similarly situated to the other homes in Westfield Terrace; they receive their water from the municipal authority and the ground under the homes is likely contaminated. Testimony of Don Paul Shearer (hereafter "Shearer Testimony").

45. Plaintiffs' expert, Mr. Shearer, based his opinion of a diminution in the value of Plaintiffs' property entirely on the fact that, in selling the homes, Plaintiffs would have to disclose to potential buyers the fact that the wells and ground were contaminated. He did no specific analysis of the real estate market in the area. Shearer Testimony.

46. The Government's expert, James McGraw, performed two studies. One showed no change in the value of property in Westfield Terrace and noted that houses in the development had been sold recently. Another compared Westfield Terrace with another development and determined that the values of homes in Westfield Terrace actually increased after 1988. Testimony of James McGraw (hereafter "McGraw Testimony"); *see also,* Old York Road, Fairview Township, York County, Pennsylvania (McGraw Report), Government's Exh. 44.

47. Mr. McGraw interviewed other real estate brokers and they indicated to him that they did not regard the contamination as likely to affect the value of homes in Westfield Terrace. McGraw Testimony; McGraw Report.

48. It is unclear whether the buyers of the homes that were sold in Westfield Terrace knew of the contamination problem. McGraw Testimony.

49. There is no evidence that any of the Plaintiffs have attempted to sell their homes and been unsuccessful or received a price lower than market value. Hamacher Testimony; O'Neal Testimony; Testimony of John O'Donnell (hereafter "J. O'Donnell Testimony").

50. None of the Plaintiffs have expressed a desire or intent to sell their homes. Hamacher Testimony; V. O'Donnell Testimony; J. O'Donnell Testimony.

51. There is no evidence beyond Mr. Shearer's conjecture that the values of Plaintiffs' homes have been lessened by the contamination.

52. Plaintiffs have incurred the expense of paying for municipal water, although that expense is offset somewhat because they no longer use electricity to power well pumps.

## CONCLUSIONS OF LAW

*Direct Negligence*

 1. A federal district court considering common-law claims brought under the

Federal Tort Claims Act, 28 U.S.C. § 1346(b), is to apply the substantive law of the state in which the alleged transgression occurred. *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 590–91, 7 L.Ed.2d 492 (1962). As it is undisputed that all actions complained of in this case took place in Pennsylvania, we will apply the law of the Commonwealth.

2. The well-established elements of negligence include (a) a duty or obligation recognized by law requiring the actor to conform to a certain standard of conduct; (b) a failure to conform to the standard required; (c) a causal connection between the failure and the resulting injury; and (d) actual injury resulting to the interest of another. *Orner v. Mallick,* 432 Pa.Super. 580, ——, 639 A.2d 491, 492–93 (1994).

3. Plaintiffs failed to offer testimony regarding the appropriate standard of care to which the Army should be held while the Government offered the uncontradicted testimony of Dr. Minear that NCAD toxic chemical handling was in accordance with then-existing industry standards. As a result, Plaintiffs have failed to prove by a preponderance of the evidence that the Army conduct at NCAD fell below an appropriate standard of care. There was, therefore, no direct negligence.

*Negligence* per se

4. Negligence *per se* may be demonstrated by proof that a defendant has violated a law or regulation whose purpose is found to be, at least in part (a) to protect a class of persons which includes the one whose interest is invaded, (b) to protect the particular interest which is invaded, (c) to protect that interest against the kind of harm that has resulted, and (d) to protect that interest against the particular hazard from which the harm results. *Centolanza v. Lehigh Valley Dairies,* 430 Pa.Super. 463, 476–78, 635 A.2d 143, 149–50 (1993).

5. Plaintiffs point to several environmental statutes that they allege were violated by the Army's conduct that lead to their well contamination. As noted, reference to the testimony of both hydrogeological experts, Mr. Robelen and Ms. Hewitt, indicates that most of the NCAD was hydrogeologically remote from Plaintiffs' wells. Thus, any negligence at those remote sites could not be causally related to the contamination and will not be considered here. *See, e.g.,* Plaintiffs' Revised Proposed Findings of Fact and Conclusions of Law No. 115 (relating to notices of violation from PADER regarding Tank 950).

6. In those instances in which Plaintiffs do point to alleged statutory violations in the area of the AMA, the instances did not involve either the activities that allegedly caused Plaintiffs' well contamination or the primary chemicals found in the wells. *See, e.g.,* Plaintiffs' Revised Proposed Findings of Fact and Conclusions of Law Nos. 102–04 (relating to notices of violation by the EPA and the Pennsylvania Fish and Game Commission arising from the release through the AMA's stormwater sewers of phenols and toluene that caused a large fish kill). Because the rules at issue guard against hazards unrelated to well contamination, negligence *per se* is inapplicable under the standard of *Centolanza.*

7. The 1969 USAEHA Report indicating that certain discharges into the Marsh Run Creek violated Pennsylvania environmental laws (*see* Finding of Fact 26) did not refer to activities or violations that could have resulted in Plaintiffs' well contamination. Further, the environmental laws in question refer to preservation of aquatic life. Thus, negligence *per se* is inapplicable under the standard of *Centolanza.*

8. Plaintiffs have failed to prove by a preponderance of the evidence that the Army's conduct amounted to negligence *per se. Centolanza v. Lehigh Valley Dairies, Inc.,* 430 Pa.Super. 463, 476–78, 635 A.2d 143, 149–50 (1993).

Res Ipsa Loquitur

9. Negligence may be proven by a theory of *res ipsa loquitur* where there is evidence, *inter alia,* that the event is of a kind that does not ordinarily occur in the absence of negligence. *Smick v. City of*

*Philadelphia,* 161 Pa.Cmwlth. 622, ——, 638 A.2d 287, 289–90 (1994).

10. As discussed, *ante,* it is possible for well contamination of the kind found in this case to occur in the absence of negligence; *i.e.,* the migration happened even though the NCAD personnel did not fall below an appropriate standard of care. Therefore, *res ipsa loquitur* is not appropriate in this case.

11. Therefore, Plaintiffs have failed to prove by any of the proffered three theories that NCAD personnel were negligent.

*Medical Monitoring*

12. Although it has not expressly done so, the Pennsylvania Supreme Court would recognize a cause of action for medical monitoring. *In Re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829, 851 (3d Cir.1990); *see also, Merry v. Westinghouse Electric Corp.,* 684 F.Supp. 847 (M.D.Pa.1988) (Caldwell, J.).

13. In order to prevail on a claim for medical monitoring, Plaintiffs must prove the following by a preponderance of evidence:

A. they were significantly exposed to a proven hazardous substance though the negligent actions of Defendants;

B. as a proximate result of exposure, the Plaintiffs suffer a significantly increased risk of contracting a serious latent disease;

C. that the increased risk makes periodic diagnostic medical examinations reasonably necessary; and

D. monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.

*Paoli,* 916 F.2d at 852.

14. Although we have found that the contaminants in Plaintiffs' wells migrated from the area around the chromium sump on the NCAD, Plaintiffs have failed to prove by a preponderance of the evidence that the migration of chemicals resulted from negligence on the part of the Army.

15. Even employing Dr. Greeley's liberal risk assessment, the well contamination increased Plaintiffs' chances of contracting cancer from 25 per cent to 25.03 per cent; thus, Plaintiffs have failed to prove by a preponderance of the evidence that they now face a *significantly* greater chance of contracting cancer as required by *Paoli.*

16. Because there was no testimony quantifying the probability that any Plaintiff will contract a disease other than cancer, Plaintiffs have failed to prove by a preponderance of the evidence that the well contamination caused them a significantly higher risk of contracting non-cancerous diseases.

17. Because Plaintiffs have failed to prove that the contamination resulted from negligence and because they have failed to prove that they face a significantly increased risk of contracting a serious latent disease, they have not met their burden with respect to their medical monitoring claim.

*Diminution of Property Value*

18. In order for a court to conclude that harm to property is permanent and irreparable, a plaintiff must establish that (A) the harm was caused by a *de facto* taking or (B) the harm is "unequivocally beyond repair." *In Re Paoli R.R. Yard PCB Litigation,* 811 F.Supp. 1071, 1075 (E.D.Pa.1992), *citing Kirkbride v. Lisbon Contractors, Inc.,* 385 Pa.Super. 292; 560 A.2d 809, 812 (1989).

19. Pennsylvania law presumes that damage to property is temporary and remediable. *Paoli,* 811 F.Supp. at 1075.

20. Although the Pennsylvania courts have not considered the question, we agree with the prediction of the U.S. District Court for the Eastern District of Pennsylvania that the Pennsylvania Supreme Court would not recognize a claim for damages arising solely from the stigma of contamination. *Paoli,* 811 F.Supp. at 1076–77.

21. Because Plaintiffs' homes are now similarly situated to other homes in Westfield Terrace, because only the Government offered evidence of actual property values in the development (showing no evidence of diminution), and because Plaintiffs' only evidence regarding property-value diminution (Mr. Shearer's testimony) referred to "stigma" damage, we conclude that Plaintiffs have failed to sustain their burden with re-

spect to their claim for diminution of property values.

*Emotional Distress*

22. In order to prevail on a claim for negligent infliction of emotional distress, a plaintiff must prove the following by a preponderance of the evidence: (A) negligence, (B) emotional distress, (C) causation, (D) physical harm manifested by objective symptomatology, and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case. *See Kraus v. Consolidated Rail Corp.*, 723 F.Supp. 1073, 1088 (E.D.Pa.1989); *Bubash v. Philadelphia Elec. Co.*, 717 F.Supp. 297, 300 (M.D.Pa.1989) (Caldwell, J.); *Houston v. Texaco, Inc.*, 371 Pa.Super. 399, 403; 538 A.2d 502, 504 (1988); *Cathcart v. Keene Indus. Insulation*, 324 Pa.Super. 123; 471 A.2d 493, 508 (1984).[5]

23. Because they have not proved that the Army was negligent, Plaintiffs have likewise failed to make out a case for negligent infliction of emotional distress.

24. Because they have demonstrated no present physical ailments arising from their exposure to the contaminated well water, Plaintiffs have failed to make out a claim for negligent infliction of emotional distress. *Bubash*, 717 F.Supp. at 300; *Houston*, 371 Pa.Super. at 405, 538 A.2d at 505.[6]

*Trespass and Private Nuisance*

25. Under Pennsylvania law, an actor is liable for damages for a non-trespassory invasion of another's interest in the private use and enjoyment of land if, (a) the other has property rights and privileges in respect to the use or enjoyment interfered with; and (b) the invasion is substantial; and (c) the actor's conduct is the legal cause of the invasion; and (d) the invasion is either (i) intentional and unreasonable; or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultrahazardous conduct. *Reinhart v. Lancaster Area Refuse Authority*, 201 Pa.Super. 614, 617; 193 A.2d 670, 671 (1963), *citing* Restatement (Second) of Torts §§ 822 and 832.

26. Plaintiffs have failed to prove by a preponderance of the evidence that the Army was negligent, reckless, or that it was engaged in an ultrahazardous course of conduct.

27. Pennsylvania law defines a private nuisance as an "unreasonable, unwarrantable, or unlawful use by a person of his own property which causes injury, damage, hurt, inconvenience, annoyance or discomfort to one in the legitimate enjoyment of his reasonable rights of person or property." *Smith v. Alderson*, 262 Pa.Super. 387, 389; 396 A.2d 808, 810 (1979).

28. Plaintiffs have failed to prove by a preponderance of the evidence that the Army's conduct at the NCAD was "unreasonable, unwarrantable, or unlawful."

29. Therefore, Plaintiffs have failed to sustain their burdens of proof with regard to their claims of trespass and private nuisance.[7]

30. Because Plaintiffs have failed to meet their burdens of proof with regard to each cause of action, a verdict and judgment should be entered in favor of Defendants.

## DISCUSSION

We have reviewed carefully the testimony offered at trial and the documentary evidence submitted by the parties. While we

---

5. Although it is not entirely clear from Plaintiffs' filings, we presume that Plaintiffs' claim for "emotional distress" is premised on negligent infliction of emotional distress rather than intentional infliction of emotional distress. If this presumption is incorrect, we note that Plaintiffs have also failed to make out a claim of intentional infliction of emotional distress. *Wisniewski v. Johns–Manville Corp.*, 759 F.2d 271, 275 (3d Cir.1985).

6. The only physical symptoms Plaintiffs tie to the contamination is their varying levels of sleep loss. While we appreciate the stress that has occasioned such problems, we do not conclude that sleep loss is the sort of physical manifestation called for by the case law.

7. We do not consider the prospect of a public nuisance because it is clearly not applicable given the facts of this case.

can well understand why Plaintiffs feel aggrieved, we must conclude that they have failed to sustain their burdens with respect to the causes of action they assert.

The allegation of negligence is central to the major claims in this case: the claim for medical monitoring and the claim for emotional distress. Plaintiffs, however, have not offered evidence sufficient to compel a conclusion that the Army acted negligently. While the Army is certainly responsible for the well contamination, the law requires something more: namely, that the Army's actions that lead to the contamination fall below the standard of care of a reasonable institution. *Orner v. Mallick*, 432 Pa.Super. 580, ——, 639 A.2d 491, 492–93 (1994). With regard to this element of negligence, Plaintiffs offered no clear evidence while Defendants offered the credible testimony of Dr. Minear that, during the years in which the contamination occurred, NCAD personnel acted in conformity with then-existing industry standards. Complying with an industry standard does not always absolve a party of negligence, but given that Plaintiffs have failed to demonstrate a higher reasonable standard, we must find that the Army's compliance was adequate to meet its duty of care. Plaintiffs' argument seems to be that the mere fact that the wells were contaminated by NCAD activities is sufficient to make out a negligence claim. This ignores the unfortunate fact that, sometimes, people or institutions cause harm to others without there being negligence. That fact also renders the theory of *res ipsa loquitur* inapplicable to this case. Additionally, as noted, Plaintiffs have failed to satisfy the elements for negligence *per se* as that doctrine is defined in Pennsylvania.

Similarly, we must find that Plaintiffs have not met their burden with respect to their medical monitoring claim. The *Paoli* test attempts to balance the understandable concern of those who are exposed to potentially hazardous substances with the legitimate concern of defendants that they not pay in perpetuity for testing when the risk of disease is slight. In this case, it is clear that Plaintiffs' expert overstated the risk they face. Even if he did not, he determined that Plaintiffs have a .03 per cent greater chance of contracting cancer because they drank contaminated water. Given the testimony of Defendants' expert, Dr. Smith, that the average person faces a 25 per cent risk of cancer, the additional risk can not be considered "significant," as required by the *Paoli* test.[8] Similarly, while Plaintiffs' expert, Dr. Daum, testified that they face a somewhat greater risk of non-cancerous latent disease, she did not quantify the risk and there is nothing in the record to suggest that any increased risk is significant.

Further, while we find absolutely credible Plaintiffs' assertions that they were "very upset," "terrified," "petrified," "shocked," and "scared," their testimony lacks the physical manifestation element required by Pennsylvania law for an emotional distress claim. *Bubash,* 717 F.Supp. at 300. And, as we have noted, the cause of action is predicated on negligence, which we have determined did not occur here.

As we have written, we sympathize with Plaintiffs. Through no fault of their own, they drank and otherwise used water contaminated with chemicals that slightly increase their risk of contracting serious ailments. They suffered the appreciable shock of learning of the water contamination and the inconvenience of using bottled water and of bathing in the homes of friends and family. Finally, of course, they are concerned that they or their children will suffer health effects in the future as a result of the contamination. They are victims, and they suffer that designation merely because their homes are adjacent to the NCAD (now DDRE). However, the Army has not ignored its obligation and it notified them as soon as contamination was confirmed. It provided bottled water, paid to connect Plaintiffs' homes to municipal water sources, and continues to work to clean the aquifer.

Our role in this matter is carefully constrained. We must make a reasoned evaluation of the evidence offered at trial and de-

---

8. One definition of "significant" is "having or likely to have influence or effect." Webster's Third New International Dictionary at 2116 (1981). A factor that makes a potential outcome .03 per cent more likely to occur is not "likely to have influence or effect."

termine if it satisfies the elements of the causes of action Plaintiffs have brought. That objective evaluation leads us to deny Plaintiffs' claims. In doing so, we express our hope that Plaintiffs have drawn a measure of comfort from the credible evidence adduced at trial that the additional health risk they face is minimal and that their homes have retained their value.

As noted, the Plaintiffs who participated at trial were test plaintiffs who were representative of the other 16 Plaintiffs named in this action. Actually, the claims asserted by all plaintiffs are the same causes of action as those discussed in this memorandum. As a result, our factual findings and legal conclusions apply to all Plaintiffs, so that our verdict and judgment is framed to dispose of all claims and it will terminate this proceeding.

We will issue an appropriate verdict and judgment.

## APPENDIX A

## APPENDIX B

*VERDICT AND JUDGMENT*

AND NOW, this 16th day of May, 1994, a verdict and judgment are entered in favor of Defendants Department of the Army of the United States and the United States of America and against all Plaintiffs. The Clerk of Court shall close this file.