DANCIGER OIL & REFINING CO. v. DONAHEY.

No. 34404. Nov. 6, 1951.

Rehearing Denied Dec. 4, 1951.

*238 P. 2d 308.*

Al T. Singletary, Perry, and Keaton, Wells, Johnston & Lytle, Oklahoma City, for plaintiff in error.

Henry S. Johnston, Perry, and C. C. McCollum, Pawnee, for defendant in error.

O'NEAL, J. In this case Clark Donahey recovered a money judgment against the Danciger Oil & Refining Company as damages to his land and to a water well located thereon. The parties here will be referred to as plaintiff and defendant as their relation appeared in the trial court.

Plaintiff is the owner of an 80-acre tract of land in Noble county, Oklahoma. Adjoining this tract to the west defendant owns an oil and gas lease under which it drilled an oil well in 1942 and which well at the time of the trial, in 1948, was a producing oil well.

Plaintiff contends that the defendant has permitted salt water and oil field refuse to escape from its lease, which pollution ran down a dry stream entering plaintiff's land on its west boundary line, and then running generally in an eastern direction across his land. Plaintiff used this 80-acre tract principally as a stock farm. He constructed sheds to protect his cattle from bad winter weather. On the banks of this stream a previous owner of the land had dug a water well which plaintiff used to water his cattle. It is plaintiff's contention that this well for many years produced an abundant supply of good pure water, suitable for drinking purposes but primarily used for stock cattle. Plaintiff claims that the oil well owned and operated by defendant produced large quantities of brine, commonly called salt water, as well as other oil field refuse; that the salt brine was conveyed from the oil well and impounded in two or three salt water pits on defendant's lease; that around said well and pits were large quantities of oil field pollution which caused the injuries complained of. It is plaintiff's contention that these deleterious substances seeped and overflowed from said pits and well and ran into the draw, or small stream, entering plaintiff's land; that the oil field pollution seeped into the fresh water strata permanently destroying the use of the water produced from plaintiff's well. These injuries are claimed to be of a permanent nature and on this theory plaintiff obtained the judgment here complained of.

In the trial court defendant contended that no salt water or other oil field pollution escaped from its leasehold operations, and that plaintiff's water well was in no manner injured by its operations, and, in any event, whatever injury that may have resulted to plaintiff was temporary and not of a permanent nature, and that therefore the verdict and judgment against it cannot be sustained.

Defendant also urges here that the trial court should not have permitted

plaintiff to testify as to certain "evaporation experiments" of water taken from the well and like experiments of water and soil taken from a depression in the stream near plaintiff's well. Defendant also complains that the water from the well was not used for drinking purposes, or household use, and that if the water is contaminated it still is fit for livestock.

One additional complaint is made that the instruction of the trial court in which it submitted the question of the usability of the well water for human consumption and household purposes was not an issue in the case, and therefore its admission was prejudicial.

These contentions of the defendant that there was not evidence justifying the verdict and judgment against it requires a consideration of the evidence in the record.

The record discloses that a number of farmers who lived near the properties of the plaintiff and defendant testified that the oil well produced substantial quantities of brine; that there were two or three salt water pits used in impounding this brine; that near these pits and the oil well there was evidence of oil field pollution, and that plaintiff operated the only oil well within the drainage area of the dry creek running from the oil operations and which entered the plaintiff's land. It is established by an abundance of evidence that 15 or 20 years prior to defendant bringing in the oil well the plaintiff's water well produced good water free from salt brine and oil field pollution. Many of plaintiff's neighbors used the water in time of droughts for watering their stock. It was used in steam boilers operating threshing machines and otherwise. These facts are not controverted. Defendant's oil well was brought in as a producer in 1942. In the year 1945 plaintiff hauled water from his well for use of his livestock on his home place several miles distant. His claim is that this water caused his stock to scour and caused the hair of the cattle to turn the wrong way. Corroborative of this claim, a veterinarian testified as to the effect of salt water on livestock, and stated that it makes livestock sick, causing scouring and roughing of hair, and at times causes death. He also stated that he frequently visited plaintiff's lease and that he found it was about in as bad a condition as you generally see anywhere in an oil field, and that in his judgment, from past observation of oil fields, it would take 15 years, or more, for the oil field pollution of the type on plaintiff's lease to clear up and wash away. That certain quantities of salt water escaped from the defendant's property is in a measure sustained by the defendant's witnesses. Defendant's production superintendent, who came to the lease on several occasions during the years 1945 to 1948, stated that in 1946 plaintiff complained about salt water pollution affecting his well and that some time thereafter he had the pits filled up and disposed of the brine in an intake well. When asked: "Since you have been in charge of this area has any salt water escaped from your salt water pits from the Caldwell lease, that you know of?" his reply was: "Not to my knowledge, no." Another employee of defendant in charge of the lease from 1942 to 1947 was asked by defendant's counsel if any salt water got away from the pits. His reply was: "Well, nothing but the seepage, there wasn't no—unless a flood came, something like that where it would come a big rain, might have been some." He also stated that plaintiff advised him as early as 1943 that salt water was getting into his water well. Defendant's pumper on the lease since 1947, when asked if there was any seepage from the lease, replied: "Not that I know of." Under this record we are of the opinion that the evidence warranted the finding of the pollution and the resulting injury to plaintiff, and that the judgment must prevail unless the errors assigned are well taken.

Defendant's first and second assignments of error go to the admission of

evidence of certain so-called "evaporation experiments." In the summer of 1947 plaintiff pumped several gallons of water from the well in question. He poured this water from time to time into several pyrex dishes. When the water entirely evaporated a sediment or residue was contained in these dishes. He made similar tests of water taken from a depression located in the creek some 20 feet from the water well. Plaintiff testified that this sediment or residue in the pyrex dishes was salt; that he tasted it and knew it was salt. Defendant's contention below was, and here is, that plaintiff was not qualified to make the tests and testify as to its result, basing its objection on the ground that plaintiff was not a chemist and could not, therefore testify as to the component elements of the residue content. In other words, the witness was not shown to be an expert witness. Defendant relies on the case of Ruth Fuel Co. v. Nichter, 174 Okla. 601, 51 P. 2d 502, in support of his proposition here submitted. In that case, over the defendant's objection, the court permitted plaintiff to display to the jury the result of an experiment made by plaintiff, by pouring salt water upon two small jardiniere foliage plants. The court said that the experiment was too far removed and remote from the issues to be of any aid to the jury in arriving at the truth of the matter in dispute, and that the evidence might well be prejudicial in such a trial.

The controversy in the present case was whether salt water and oil field refuse escaped from defendant's lease and whether it seeped into plaintiff's water well and permanently destroyed his water supply. The water taken from the depression in the creek some 20 feet from the well, as well as the water from the well, under the experiment, disclosed that the residue was salt. Plaintiff was asked if from his own knowledge he could state the contents of the residue in the pyrex dishes. His reply was: "I can tell you there is plenty of salt. I can taste it and see it.

I know it is salt." Plaintiff was not called as an expert witness and his failure to qualify as a chemist would not foreclose him from stating that the residue in the pyrex dishes was salt. Such knowledge is common and requires no expert testimony. The jury were permitted to draw their own conclusions as to the correctness of the plaintiff's deductions. In Ruth Fuel Co. v. Nichter, supra, the court says:

"It is well settled that experiment evidence may in a proper case be admissible where the material facts bearing on a particular issue are precisely duplicated in the experiment, but the criterion . . . admissibility of such evidence is whether such evidence tends to enlighten the jury, and enable them to . . . intelligently determine the issues presented."

It was an important issue whether the drainage creek conveyed salt water and oil field pollution emanating from defendant's oil well and salt water pits, and whether sufficient quantities of oil field pollution destroyed plaintiff's water well.

The lower court had no occasion to pass on plaintiff's qualifications as an expert witness, qualified to give the component elements of the mineral contained in the pyrex dishes. The witness was not offfered as an expert witness, but as a witness who made an experimental test, the result of which would enlighten the jury and enable them to make a more intelligent determination as to whether the well water contained the oil field pollution complained of, and the extent of the injury thereto. We are of the opinion that defendant's propositions one and two are without substantial merit.

Defendant next urges that the record does not sustain the findings of the jury that the injury to plaintiff's water well was permanent. The lower court properly instructed the jury that if a nuisance or damage can be abated by the expenditure of labor or money, it is not permanent. Under the facts heretofore detailed, there was substantial evidence justifying the jury in finding

permanent pollution of the water well. Defendant's oil well was brought in in 1942 and was still a producing well at the time of the trial in 1948. Evidence was produced sustaining the contention that oil field waste and salt water pollution does not clear up for many years, even after production ceases. The chemical analyses of the water taken from the well by both parties disclose a comparable salt water content. No evidence was introduced to show that the injury to the water well can be abated by the expenditure of labor or money. Defendant did request permission to pump out the well and plaintiff advised defendant they could pump it out as many times as they wished to, and that if the water stayed good for six months or a year he would consider it. No effort was made to restore the well by pumping. Whether the injury was temporary or permanent was an issue properly submitted to the jury under appropriate instructions. Roxana Petroleum Corp. v. Dormire, 161 Okla. 262, 18 P. 2d 544. The word "permanent" in a legal sense is not equivalent to perpetual, or unending, or unchangeable. Permanency, in a legal acceptation of the term, does not mean forever—indefinitely long is sufficient. Argo Oil Co. v. Snouffer, 175 Okla. 382, 52 P. 2d 803; Comar Oil Co. v. Hackney, 119 Okla. 285, 250 P. 93; Richards v. Flight, 97 Okla. 9, 222 P. 564; Roxana Petroleum Corp. v. Dormire, 161 Okla. 262, 18 P. 2d 544; Shell Petroleum Corporation v. Kent, 187 Okla. 637, 105 P. 2d 230; Sinclair Oil & Gas Co. v. Allen, 143 Okla. 290, 288 P. 981; Union Oil & Mining Co. v. Bowman, 144 Okla. 54, 289 P. 296.

We, therefore, hold that defendant's proposition three is not well taken.

Defendant's fourth proposition is that this case should be reversed because the water was not used for human consumption and was not harmful for livestock. Defendant relies on the case of Shell Petroleum Corp. v. Worley, 185 Okla. 265, 91 P. 2d 679, in support of this contention. In that case water overflowed from a polluted creek which water spread out over adjoining land for a wide distance, and on which land plaintiff had planted pecan trees which plaintiff claimed were injured by the overflow water, which water tasted salty. The evidence also established that the trees might have been injured by three other causes. Under this state of facts this court held that there was no causal connection between the alleged wrongful act of the defendant and plaintiff's injuries. We think that Shell Petroleum Corporation v. Worley, supra, is clearly distinguishable under the facts disclosed in the instant case.

Defendant's fifth and last proposition urged as reversible error that the trial court erred in instructing the jury on the fitness of the water from said well for human consumption because that was not an issue in the case. Defendant, in support of said contention, relies on this court's holding in Dickson v. Joy, 188 Okla. 597, 112 P. 2d 355. The syllabus in that case reads:

"It is reversible error to give an instruction which has no application to the issues involved, or the evidence in support thereof, where it is apparent that the rights of the losing party were . . . prejudiced."

We cannot sustain defendant's contention here for three reasons:

(1) There is no showing that the rights of the losing party were thereby prejudiced. No complaint is made that the verdict of the jury is excessive.

(2) Another is that the plaintiff introduced in evidence an exhibit which discloses the mineral contents of the well water. The analysis was made in 1946 by a chemist of the Agricultural and Mechanical College at Stillwater. Plaintiff's attorney, in offering the exhibit, stated: "We offer in evidence plaintiff's exhibit 10. It may not be admissible, I think perhaps it is." The record then recites: "No objection being interposed, same is admitted." This exhibit contained the statement of the chemist that the water is unfit for drinking or cooking purposes.

It is well established by this court that evidence given without objection being made at the time and the record preserved, cannot be urged as grounds for reversal on appeal.

(3) In any event plaintiff was entitled to the use of the water in its natural state, and defendant is foreclosed from limiting plaintiff's use thereof for any specific purposes. In Cities Service Gas Co. v. Eggers, 186 'Okla. 466, 98 P. 2d 1114, this court held:

"The owner of a tract of land has the right to drill water wells at such places thereon and to such a water producing stratum thereunder as desired and has the right to take water therefrom in its natural state and from its natural source."

We hold that plaintiff's contention here is without substantial merit.

The judgment of the lower court is affirmed.