[No. B094284. Second Dist., Div. Seven. June 20, 1996.]

SANTA FE PARTNERSHIP et al., Plaintiffs and Appellants, v.
ARCO PRODUCTS COMPANY et al., Defendants and Respondents.

**COUNSEL**

John C. Teal, Jr., for Plaintiffs and Appellants.

Smith, Brennan & Dickerson, Donald D. Dickerson and Sterling A. Brennan for Defendants and Respondents.

**OPINION**

**JOHNSON, J.—** ▇▇▇ This appeal presents the question whether an owner of property contaminated by chemical pollutants can recover post-remediation "stigma" damages on a continuing nuisance theory of liability. California law provides diminution in value damages and damages for future harm may be recoverable in a situation where the nuisance is deemed to be permanent. However, prevailing law holds damages for prospective harm are unavailable where the nuisance is deemed to be continuing and abatable.

Appellants urge this court to "overrule" existing law, claiming it fails to take into account the economic and practical realities associated with properties which have a history of contamination despite successful remediation. To date our Supreme Court has only permitted recovery for diminution of value in cases of permanent nuisance where damage to the property is assessed once for all past, present and future damage. As an intermediate appellate court, we are bound to follow the decisions of our highest court. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Accordingly, we affirm the judgment denying appellants recovery for diminution in value on a theory of continuing nuisance.

## FACTS AND PROCEEDINGS BELOW

In late 1987, respondents, ARCO Products Company and Atlantic Oil Company (ARCO), arranged to remove underground storage tanks at its service station located at 13460 Firestone Boulevard in Santa Fe Springs. On December 1, 1987, a preliminary soils investigation revealed the tanks had leaked gasoline into the soil and groundwater. On December 7, 1987, ARCO removed the underground storage tanks.

Sometime prior to February 1988, ARCO reported the unauthorized release to the County of Los Angeles Department of Public Works. On February 2, 1988, the department of public works notified ARCO it was referring the matter to the state Regional Water Quality Control Board. These reports became a matter of public record.

Upon discovery of the unauthorized release ARCO engaged environmental consultants to monitor and remediate the soil and groundwater contamination. These remediation efforts are continuing under the jurisdiction of the state Regional Water Quality Control Board.

In 1987 Falcon Pacific Development, Inc. (Falcon Pacific) began negotiations to purchase undeveloped property adjoining ARCO's property from Southern Pacific Transportation Company (Southern Pacific). On September 28, 1987, Falcon Pacific submitted a written proposal to Southern Pacific to purchase the property. Pursuant to the proposal, Falcon Pacific or its nominee, was to conduct and approve "customary engineering and soils tests prior to the close of escrow."

A subsequent contract to purchase the land was accepted by Southern Pacific on April 12, 1988. Conditions precedent to performance of the contract included Falcon Pacific's approval of the soils condition, engineering and/or feasibility studies. Falcon Pacific agreed to purchase the property

"as is" and further agreed to "perform and rely solely upon its own independent investigation concerning the physical condition and possible contamination of the property."[1]

Neither Falcon Pacific nor its principal, Jim Arnold, had the capital necessary to purchase the property. In July 1988, Falcon Pacific entered into a joint venture agreement with Wallace and Harry Hansen to acquire and build a motel on the property. The Hansens were partners in an entity known as Partners Johansen. The parties named their joint venture the Santa Fe Partnership. The Santa Fe Partnership and Partners Johansen are the appellants in this action.

According to the joint venture agreement, Partners Johansen were to pay the deposit owing to Southern Pacific, provide capital for start-up costs such as soils testing, and pay the remaining $995,000 purchase price for the property. Arnold of Falcon Pacific would design, acquire necessary permits and licenses for, supervise construction of, and market the completed motel project. The parties notified escrow that ownership should vest in Santa Fe Partnership and instructions were modified to reflect Partners Johansen's 67 percent interest and Falcon Pacific's 33 percent interest in the property.

---

[1]Paragraph 7 of the purchase contract is entitled "Conditions Precedent to Final Performance Of This Agreement" and provides in pertinent part:

"7.1 . . . [¶] B. Buyer's approval of the soils condition, engineering and/or feasibility studies, and any requirements or regulations of the Department of Building and Safety, Health Department or any other city, county, state or federal authority which are pertinent to Buyer's intended use of the Property, which approval shall be given [by Buyer] as provided in paragraph 7.2.

"7.2 Buyer shall deliver to Seller and Escrow Holder Buyer's written approval or disapproval of the matters referred to in . . . paragraph 7.1(B) within forty-five (45) days from Seller's acceptance of this offer. In the event such written approval or disapproval is not received by Seller and Escrow Holder on or before the due date, it shall be conclusively presumed that Buyer has unconditionally approved each of said matters."

Paragraphs 9.1, 9.2 and 9.3 of the purchase contract pertain to the physical condition of the land.

"9.1 Buyer acknowledges that it offers and desires to purchase the Property 'as is' and without representation or warranty from Seller with respect to the condition of the Property including, but not limited to, the condition of the soil, presence of hazardous materials or contaminants, and other physical characteristics. Buyer shall perform and rely solely upon its own independent investigation concerning the physical condition of the Property.

"9.2 Seller has not and does not hereby make any representation or warranty to Buyer concerning the Property or its compliance with any statutes, ordinance or regulation. Buyer shall perform and rely solely upon its own independent investigation concerning the Property's compliance with any applicable law.

"9.3 Buyer represents that its intended use of the Property is for the construction and operation of a motel facility. Buyer shall perform and rely solely upon its own investigation concerning Buyer's intended use of the Property, the Property's fitness therefore, and the availability of such intended use under applicable statutes, ordinances and regulations."

Jim Arnold of Falcon Pacific retained AAKO Geotechnical Engineering Consultants (AAKO) to conduct soils tests on the property. On August 2, 1988, AAKO bored six holes on the property. AAKO's drilling technician recorded certain information in a "boring log" for each hole bored. The technician noted a "petroleum odor" at approximately 15 feet on one bore hole, a "strong petroleum odor" at the same depth at another bore hole, and a "very strong solvent odor" at approximately 20 and 23 feet deep on a third bore hole.

In analyzing the soil samples at AAKO's laboratory a technician observed the petroleum or solvent in one of the soils samples was so strong it melted the PVC tube in the laboratory.

AAKO subsequently prepared a written report of its findings. The drilling technician's findings of petroleum and solvent odors was attached as an appendix to the report. In the body of the report AAKO noted "[m]oderate to high petroleum or solvent odors were encountered in the western half of the site, with the highest concentration appearing to be in the vicinity of Boring B-3 (a solvent order [*sic*]). Odors were primarily encountered at depths below 14 feet."

The written report is dated August 31, 1988, the day before escrow was scheduled to close. According to AAKO's principal, it is AAKO's policy to verbally inform a client of any abnormal findings, including petroleum or solvent odors, within days of their discovery.

Thereafter, AAKO prepared a revised version of its August 31, 1988, report entitled "31 August 1988 Revised 4 November 1988" report. The revised report deletes all references to petroleum and solvent odors. AAKO's principal testified AAKO would not revise the report on its own and instructions to do so must have come from the client, Falcon Pacific. On November 4, 1988, Falcon Pacific submitted the revised AAKO report and building plans for the motel to the city of Santa Fe Springs for approval.

In May 1990, Santa Fe Partnership entered into escrow to sell the property to a Mr. Chung-Ching Kuo for $5,250,000. Mr. Kuo learned of the petroleum contamination on the property when his environmental consultants uncovered it in performing soils testing and by consulting public agency records. Mr. Kuo refused to close escrow. Santa Fe Partnership then leased the property to a Mr. Satish Patel who operates the motel.

Santa Fe Partnership and Partners Johansen (appellants) filed suit on July 29, 1992, against ARCO on theories of private nuisance, trespass, negligence, strict liability (ultrahazardous activity) and negligence per se. On

June 6, 1994, they filed their third, and the operative, complaint in this action.

On December 24, 1995, ARCO filed a motion for summary judgment or, in the alternative, for a summary adjudication of issues. In its motion ARCO pointed out appellants had either actual or imputed knowledge of contamination on the property as early as the summer of 1988.[2] As a result, ARCO argued each of appellants' causes of action was barred by the three-year statute of limitations for injury to property. (Code Civ. Proc., § 338.) ARCO also argued that, in the event appellants' trespass and nuisance claims were deemed to be continuing rather than permanent, and therefore not barred by the three-year statute of limitations, summary judgment was appropriate nonetheless because appellants had not suffered any costs for abatement of the nuisance nor loss of use damages—the only damages recoverable for continuing trespass and nuisance claims.

The trial court found the statute of limitations barred appellants' causes of action for negligence and strict liability. However, the trial court concluded there was an issue of fact whether appellants' causes of action for trespass and nuisance were permanent or continuing in nature and denied summary judgment as to those causes of action.

ARCO's experts did not know when remediation would be complete. Appellants' expert testified he expected remediation efforts to successfully remove all contamination from the property in due course. Appellants acknowledged they had not suffered any costs of abatement because ARCO had been remediating the contamination on the property at its own expense. In addition, appellants acknowledged they had not suffered, and probably would not suffer, any loss of use of their property because the contamination did not interfere with the motel operations. Thus, appellants concluded the only damage they could allege at trial were postcleanup stigma damages. However, they acknowledged California law did not allow an award of damages for diminution in value on a continuing trespass or continuing nuisance theory.

---

[2] Jim Arnold of Falcon Pacific denied receiving AAKO's initial August 31, 1988, report pointing out probable contamination on the property. Subsequent discovery tended to establish the opposite. Partners Johansen claimed they never saw anything other than the revised November 4, 1988, report, and then only after litigation had begun. They later acknowledged Falcon Pacific's acts, omissions and knowledge were imputed to them as their joint venture partner. (*Engineering Service Corp.* v. *Longridge Inv. Co.* (1957) 153 Cal.App.2d 404, 411 [314 P.2d 563]; 9 Witkin, Summary of Cal. Law (9th ed. 1989) Partnership, § 21, pp. 420-421; see also *Wilshire Westwood Associates* v. *Atlantic Richfield Co.* (1993) 20 Cal.App.4th 732, 740 [24 Cal.Rptr.2d 562] [presumptive knowledge is sufficient to commence the running of the statute of limitations].)

Rather than proceed to trial, the parties stipulated to entry of judgment in ARCO's favor in order to immediately seek review in this court to request an extension of the law which would entitle them to recover damages for diminution in value on a theory of continuing trespass or nuisance.

## DISCUSSION

### I. Under California Law, Damages for Diminution in Value for a Continuing and Abatable Nuisance Are Not Recoverable.

In *Mangini* v. *Aerojet-General Corp.* (*Mangini II*) (1996) 12 Cal.4th 1087 [51 Cal.Rptr.2d 272, 912 P.2d 1220] our Supreme Court held the landowners' suit, filed more than three years after their property had been contaminated by toxic wastes, was time-barred based on their failure to present evidence the contamination could be characterized as a continuing nuisance, i.e., proof the contamination was remediable at a reasonable cost. (12 Cal.4th at p. 1090.) The *Mangini* court limited its decision to the statute of limitations issue and expressly declined the opportunity to reach the related issues "whether a plaintiff-landowner has a power to elect whether to characterize a nuisance as continuing or permanent for statute of limitations purposes and whether the same characterization should apply for both limitations and damages purposes. . . ." (12 Cal.4th at p. 1104, fn. omitted.)

However, past decisions of our Supreme Court have specified the types of damages allowed in nuisance actions depend on whether the nuisance is characterized as permanent or continuing. These decisions have determined the types of remedies available in each action based on principles of fairness, public policy and judicial economy. Perhaps the most articulate expression of these principles is found in Justice Traynor's opinion for the court in *Spaulding* v. *Cameron* (1952) 38 Cal.2d 265 [239 P.2d 625]. In *Spaulding* the plaintiff's property was inundated with mud from loose fill her neighbor had pushed over the side of a slope while leveling his property. The trial court awarded an amount for physical damage to plaintiff's home and a separate amount for diminution in value due to the threat of future inundations. The trial court also ordered the defendant to abate the nuisance. The Supreme Court held the damages awarded were inconsistent and therefore improper.

"In early decisions of this court it was held that it should not be presumed that a nuisance would continue, and damages were not allowed for a decrease in market value caused by the existence of the nuisance but were limited to the actual physical injury suffered before commencement of the action. [Citations.] The remedy for a continuing nuisance was either a suit for injunctive relief or successive actions for damages as new injuries

occurred. Situations arose, however, where injunctive relief was not appropriate or where successive actions were undesirable either to the plaintiff or the defendant or both. *Accordingly, it was recognized that some types of nuisances should be considered permanent, and in such cases recovery of past and anticipated future damages were allowed in one action.* [Citations.]

"The clearest case of a permanent nuisance or trespass is the one where the offending structure or condition is maintained as a necessary part of the operations of a public utility. Since such conditions are ordinarily of indefinite duration and since the utility by making compensation is entitled to continue them, it is appropriate that only one action should be allowed to recover for all the damages inflicted. It would be unfair to the utility to subject it to successive suits and unfair to the injured party if he were not allowed to recover all of his probable damages at once. [Citation.]

"A more difficult problem is presented, however, if the defendant is not privileged to continue the nuisance or trespass but its abatement is impractical or the plaintiff is willing that it continue if he can secure full compensation for both past and anticipated future injuries. To attempt categorically to classify such a nuisance as either permanent or not may lead to serious injustice to one or the other of the parties. Thus, if the plaintiff assumes it is not permanent and sues only for past damages, he may be met with the plea of res judicata in a later action for additional injury if the court then decides the nuisance was permanent in character from its inception. [Citation.] Similarly, if the initial injury is slight and plaintiff delays suit until he has suffered substantial damage and the court then determines that the nuisance was permanent, the defendant may be able to raise the defense that the statute of limitations ran from the time of the initial injury. [Citation.] *On the other hand, if the defendant is willing and able to abate the nuisance, it is unfair to award damages on the theory that it will continue.* [Citations.]

"Because of these difficulties it has been recognized that in doubtful cases the plaintiff should have an election to treat the nuisance as either permanent or not. [Citations.] If the defendant is not privileged to continue the nuisance and is able to abate it, he cannot complain if the plaintiff elects to bring successive actions as damages accrue until abatement takes place. [Citations.] On the other hand, if it appears improbable as a practical matter that the nuisance can or will be abated, the plaintiff should not be left to the troublesome remedy of successive actions. [Citations.]" (*Spaulding* v. *Cameron, supra,* 38 Cal.2d at pp. 267-269, italics added.)

Based on these characterizations of a nuisance as either permanent or continuing, and the types of remedies available to a plaintiff in each of these

contexts, the Supreme Court concluded the trial court erred in both ordering the defendant to abate the nuisance (impliedly finding the nuisance was abatable and therefore of a continuing nature) and in awarding damages for diminution in value (appropriate only in a situation where the nuisance is unabatable as a practical matter and is therefore deemed to be permanent). "The findings and conclusions of the trial court on these conflicting contentions are inconsistent. The court found that plaintiff's property had been permanently damaged because of the continuing threat of future injury. It also found, however, that this threat would continue unless corrective measures were taken, and by ordering that such measures be taken impliedly found that they were feasible. *It is clear that plaintiff cannot have both remedies*. If defendant obeys the injunction and takes such measures that " 'the property of the plaintiff will not be endangered or threatened by the existence of such deposits of loose dirt,' " there will no longer be a threat to depreciate the value of the property. *Plaintiff would obtain a double recovery if she could recover for the depreciation in value and also have the cause of that depreciation removed.*" (*Spaulding* v. *Cameron, supra,* 38 Cal.3d at p. 269, italics added.)

The Supreme Court remanded the matter for a determination whether the nature of the nuisance was permanent or continuing and to fashion relief accordingly.

Thus, the decision in *Spaulding* v. *Cameron, supra,* 38 Cal.2d 265 stands for the proposition a plaintiff-landowner cannot recover damages for future or prospective harm, including damages for diminution in value, in a case where the nuisance is deemed to be continuing and abatable.

Subsequent decisions of our Supreme Court have held to the distinction of the remedies available depending on whether the nuisance is continuing or permanent. For example, in *Baker* v. *Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862 [218 Cal.Rptr. 293, 705 P.2d 866] the court reiterated the principle that how the nuisance was classified dictated the nature of remedies available to the plaintiff-landowner. ■ "Two distinct classifications have emerged in nuisance law which determine the remedies available to injured parties and the applicable statute of limitations. On the one hand, permanent nuisances are of a type where ' "by one act a permanent injury is done, [and] damages are assessed once for all." ' (*Williams* v. *Southern Pacific R.R. Co.* (1907) 150 Cal. 624, 626 [89 P. 599].) . . . In such cases, plaintiffs ordinarily are required to bring one action for all past, present and future damage within three years after the permanent nuisance is erected. . . .

"On the other hand, if a nuisance is a use which may be discontinued at any time, it is considered continuing in character and persons harmed by it may bring successive actions for damages until the nuisance is abated. (*Phillips* v. *City of Pasadena* (1945) 27 Cal.2d 104, 107-108 [162 P.2d 625].) *Recovery is limited, however, to actual injury suffered prior to commencement of each action. Prospective damages are unavailable.*" (*Baker* v. *Burbank-Glendale-Pasadena Airport Authority, supra,* 39 Cal.3d 862, 868-869, italics added; see also *Kornoff* v. *Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 268-269 [288 P.2d 507]; *City of San Jose* v. *Superior Court* (1974) 12 Cal.3d 447, 464 [115 Cal.Rptr. 797, 525 P.2d 701, 76 A.L.R.3d 1223].)

Decisions of the Courts of Appeal have necessarily followed these distinctions. In *Mangini* v. *Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125 [281 Cal.Rptr. 827] (*Mangini I*) plaintiffs brought suit for damage to their property caused by the dumping of toxic waste on adjoining land. The trial court sustained the defendant's demurrer without leave to amend. The Court of Appeal reversed the judgment of dismissal finding, among other things, the plaintiffs could amend their complaint to plead facts showing a continuing nuisance and trespass.

In their complaint plaintiffs claimed their property was "unusable and extremely difficult to market for an indefinite period of time." They claimed there was little likelihood the property "will ever be as valuable as it would have been if not contaminated." In the prayer of the complaint plaintiffs sought the diminution in market value of their respective properties as damages. (*Mangini I, supra,* 230 Cal.App.3d 1125, 1145.) The Court of Appeal agreed with the defendant this type of damage award would not be available under a continuing trespass theory and noted, "[t]his form of relief is incompatible with a claim based on injuries caused by continuing nuisance. [Citations.]" (*Ibid.*)

In *CAMSI IV* v. *Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525 [282 Cal.Rptr. 80], the appellate court considered a landowner's claims for negligence, negligence per se and strict liability against a former lessee of the property, which had allegedly contaminated the property during its leasehold. The Court of Appeal affirmed the trial court's decision to sustain the defendant's demurrer without leave to amend, noting that the claims were time-barred.

During oral argument, plaintiff's counsel confirmed his client did not intend to bring a cause of action for nuisance. (*CAMSI IV* v. *Hunter Technology Corp., supra,* 230 Cal.App.3d at p. 1539.) After the court issued its

opinion, the Court of Appeal issued its decision in *Mangini I*. Based on this new authority, plaintiff petitioned for rehearing, arguing the trial court abused its discretion by denying it leave to amend to plead theories of continuing trespass and continuing nuisance. The appellate court denied the petition and in its order stated: "For reasons well explained in *Mangini*, CAMSI IV could have avoided the bar of the statute of limitations only by pleading continuing nuisance and continuing trespass, but had it done so it would have limited its available relief in damages to harms shown to have accrued before its action was filed (which would not have included, for example, diminution in market value of the parcel.)" (*CAMSI IV* v. *Hunter Technology Corp.*, *supra*, 230 Cal.App.3d at p. 1542, italics omitted.)

The foregoing authorities are representative of the decisions holding California law does not allow future or prospective damages, including diminution in value damages, in a continuing nuisance case. (See also *Capogeannis* v. *Superior Court* (1993) 12 Cal.App.4th 668, 679 [15 Cal.Rptr.2d 796] [recovery of future damages would be inconsistent with a theory of continuing nuisance]; *Alexander* v. *McKnight* (1992) 7 Cal.App.4th 973, 978 [9 Cal.Rptr.2d 453] [equitable relief ordering abatement plus an award of damages for future harm would unjustly enrich the plaintiffs]; *Mozzetti* v. *City of Brisbane* (1977) 67 Cal.App.3d 565, 575-576 [136 Cal.Rptr. 751] [instruction on damages improperly allowed plaintiffs to receive damages for both the cost of remediation and the decrease in property value]; *Rhodes* v. *San Mateo Investment Co.* (1955) 130 Cal.App.2d 116, 118 [278 P.2d 447] [damages for depreciation in market value could not be allowed where court had issued injunction ordering the defendant to abate the nuisance]; see also 6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1472, pp. 941-943 [to have the cause of depreciation removed and at the same time receive damages for the depreciation would amount to double recovery]; 9 Miller & Starr, Cal. Real Estate (2d ed. 1990) Landowners' Liability, § 29:12, p. 85 [with a continuing nuisance a plaintiff can recover past and present damages, but not future damages, since the abatement order will terminate the nuisance for the future].)

Appellants acknowledge the current state of California law. However they claim the concept property reverts to its precontamination value once the contamination is remediated does not conform to market realities. They claim remediation may take as long as 20 years, or more in some cases. In these situations it is difficult, if not impossible, to sell or secure a loan against the land due to the stigma which attaches to previously contaminated property. They argue this prevents a land speculator or investor from realizing his or her profit, and, because investment moneys are locked up in the

contaminated property, prevents such persons from using that investment money for other projects. Appellants therefore request this court to "overrule" existing law and allow "stigma" damages as a proper remedy for a continuing nuisance caused by chemical pollution of the land.

We acknowledge the logic and general appeal of this argument in the context of contamination from extensive toxic or hazardous waste. However, this court does not write on a clean slate. As an intermediate appellate court we are bound to follow and apply the decisions of our highest court, which expressly disallow prospective damages in cases of continuing nuisance.[3] (*Spaulding* v. *Cameron, supra*, 38 Cal.2d 265; *Auto Equity Sales, Inc.* v. *Superior Court, supra*, 57 Cal.2d 450, 455.) Accordingly, we reject appellants' request to create new law to permit recovery of diminution in value damages in a continuing nuisance case.

> II.   *Courts of Other Jurisdictions Which Permit Damages for Diminution in Value Do So on a Finding the Nuisance Has Permanently Injured the Property or Poses a Threat of Future Injury and Therefore Do Not Support Appellants' Argument for a Good Faith Extension of the Law Regarding Continuing Nuisances.*

Appellants claim courts of other jurisdictions have been moving ahead of California in the area of toxic tort damages. They claim some jurisdictions acknowledge injury to land from toxic or hazardous materials does not fit neatly into a category as either a permanent or temporary nuisance. Appellants claim these jurisdictions recognize the contamination may continue for an indefinite period despite aggressive remediation efforts. They point out these courts would likely permit "stigma" damages as a component of the diminution in value of the land caused by the contamination, whether or not complete remediation is feasible in the immediate future.

Both sides cite the decision in *F.D.I.C.* v. *Jackson-Shaw Partners No. 46 Ltd.* (N.D.Cal. 1994) 850 F.Supp. 839 as supporting their position. ARCO points out the decision applies California law and denies diminution in value damages in a continuing nuisance case. Appellants claim the decision suggests "stigma" damages may nevertheless be appropriate in a permanent nuisance case.

In *F.D.I.C.* v. *Jackson-Shaw Partners No. 46 Ltd., supra*, 850 F.Supp. 839 a partnership borrowed $20 million to acquire and construct a commercial

---

[3]The same result and rationale applies to the claim for continuing trespass. (See, e.g., *Mangini II, supra*, 12 Cal.4th at p. 1103.)

development on a 20-acre parcel of land in San Jose. The loan was secured by a deed of trust on the property. The partnership later discovered releases of hazardous substances from two adjacent sites had contaminated the soil and ground water beneath a portion of its property. The owners of the adjacent properties, Chevron and Solvent Service Company, Inc. (SSI), agreed to clean up the site and to indemnify the partnership for liabilities which arose out of the contamination. Experts predicted it would take at least 20 years to restore the property to its precontamination condition.

The partnership was unable to repay the loan and the Federal Deposit Insurance Corporation (FDIC) brought suit. The partnership cross-complained against Chevron and SSI for permanent trespass and nuisance. When the partnership realized those causes of action were barred by the statute of limitations, it filed an amended cross-complaint for continuing trespass and continuing nuisance seeking diminution in value damages.

Chevron and SSI brought a motion to dismiss, contending diminution in value damages were not available for a continuing nuisance claim. The district court analyzed California law and concluded the nuisance and trespass claims should be dismissed because ". . . California courts which have spoken in this area are uniformly of the view that diminution in value damages are not compensable in a continuing trespass or nuisance case. . . ." (850 F.Supp. at p. 843.)

The partnership attempted to distinguish the decisions in *Spaulding, Mangini I,* and *CAMSI IV*. The partnership argued its damages were not prospective. Because of the contamination it was unable to sell the property and it lost an opportunity to escape a deficiency judgment as well. The partnership also claimed the parcel will never revert to its fair market value because of the stigma which attaches to property with a history of contamination. Finally, the partnership argued California courts are flexible in determining damages for injury to property and adopt whatever formula will most adequately compensate the injured party for the loss it sustained. (850 F.Supp. at p. 843.)

In rejecting the partnership's arguments the district court noted diminution in value damages, caused by stigma associated with a property with a history of contamination, would likely have been recoverable had its claim for permanent trespass and nuisance not been barred by the statute of limitations. (850 F.Supp. at p. 844.) "Although it is axiomatic that a tortfeasor is liable for all damages proximately caused by his or her conduct [citations], an injured party's claim is barred if it is not filed within the applicable

limitations period. [The partnership] has already admitted that its claims for permanent nuisance and permanent trespass are barred by the statute of limitations. Were they not barred, the partnership would, in all likelihood be able to recover diminution in value damages, [citations], which might include a component relating to the stigma caused by the contamination, although this remains an open question. [Citations.] As the discussion above reveals, the weight of California courts which have spoken to this issue have rejected attempts to recover such damages under continuing trespass or continuing nuisance theories. It is easy to see why. The principal assumption underlying continuing trespass and continuing nuisance theories is that the activity causing the injury can be abated. Thus, the damages are distinct from those arising from conduct constituting permanent trespass and permanent nuisance. To accept [the partnership's] reasoning would permit parties seeking recovery for time-barred permanent trespass and permanent nuisance claims to avoid the statute of limitations simply by recharacterizing them as continuing trespass and continuing nuisance claims. The Court cannot permit the statute of limitations to be eviscerated in this fashion.

"California law limits damages for continuing trespass and continuing nuisance to abatement and loss of use. SSI and Chevron have agreed to indemnify [the partnership] for remediation costs and Wallace Murfit has admitted that the partnership has suffered no loss of use damages." (850 F.Supp. at p. 844, fn. omitted.) Accordingly, the district court dismissed the partnership's claims for continuing nuisance and trespass. (*Ibid.*)

Appellants also cite in support of their argument the Iowa Supreme court decision in *Mel Foster Co. Prop., Inc.* v. *American Oil Co.* (Iowa 1988) 427 N.W.2d 171. In *Mel Foster* the Supreme Court of Iowa held nuisance actions for land contaminated by chemical pollutants should be classified as permanent nuisances so as to entitle the landowner to diminution in market value damages.

In *Mel Foster* a property owner's land was contaminated by gasoline which had leaked from an underground gasoline tank on an adjacent property owned by U-Haul and from a distribution line from a nearby gasoline station owned by Amoco. U-Haul and Amoco immediately took steps to clean up the gasoline leaks. The landowner brought suit against U-Haul and Amoco on a variety of theories. The case was tried to the jury on a nuisance theory. The trial court ruled the nuisance was temporary and the landowner could bring successive suits to recover damages for lost rents until the nuisance was fully abated. The trial court instructed the jury the proper measure of damages was the reduction of reasonable rental value of the

property caused by the nuisance measured from discovery of the gasoline leak to the time of trial. The jury found for the landowner and awarded $188,000 in damages.

On appeal the parties disputed whether the nuisance was properly classified as temporary. The Supreme Court of Iowa acknowledged "[u]nderground gasoline contamination does not fit neatly into a category as either a temporary or permanent nuisance. Case law concerning temporary nuisances often deals with the type of interference with the use of property which is abated when the cause of the nuisance has abated. [Citations.] These cases, which address an interference with the use of property but do not encompass injury to the property itself, are not instructive in dealing with chemical pollution to real estate which will remain in the soil for an indefinite period of time. In *McGill v. Pintsch Compressing Co.*, 140 Iowa 429, 435, 118 N.W. 786, 789 (1908), this court stated: [¶] [']In such a case [temporary nuisance], *in the absence of injury to the property itself*, the measure of damages is the diminution in the rental value caused by the maintenance of the nuisance.['] *Id.* (emphasis added [by court]).

"Other cases suggest that if a nuisance causes damage which will be presented for an indefinite period of time, that nuisance should be considered permanent. *See Ryan v. City of Emmetsburg*, 232 Iowa 600, 608, 4 N.W.2d 435, 441 (1942) ('it may be said that a permanent nuisance is one of such character and existing under such circumstances that it will be reasonably certain to continue indefinitely into the future'); *see also Hudson v. Peavy Oil Co.*, 279 Or. 3, 10, 566 P.2d 175, 179 (1977) (permanent in the sense that injury was likely to persist for an undetermined but significant period of time); *Mikol v. Vlahopoulos*, 86 Ariz. 93, 94, 340 P.2d 1000, 1001 (1959) (nuisance considered permanent if it 'will remain even though the cause has been abated'). The case of *Danciger Oil & Refining Company v. Donahey*, 205 Okla. 390, 238 P.2d 308 (1951), correctly states the context in which the word 'permanent' must be understood: [¶] [']The word "permanent" in a legal sense is not equivalent to perpetual, or unending, or unchangeable. Permanency, in a legal acceptation of the term, does not mean forever—indefinitely long is sufficient.['] *Id.* at 394, 238 P.2d at 312; *see also Sinclair Refining Co. v. Bennett*, 123 F.2d 884, 886-87; *Note, Stream Pollution—Recovery of Damages*, 50 Iowa L.Rev. 141, 152 (1964).

"Chemical contamination of land, such as the gasoline on Foster's property, encompasses aspects of both a temporary and permanent nuisance. This injury is temporary in the sense that the cause of the pollution has been discovered and abated, and the harmful chemicals in the ground will eventually dissipate. This nuisance is permanent in the sense that it constitutes

damage to the ground itself and will continue for an indefinite but significant period of time. An attempt to classify chemical pollution as a permanent or temporary nuisance is further complicated by the presence of rapidly changing scientific technology. Scientific knowledge enables society to successfully clean up pollution once thought to be permanent; it also reveals hidden dangers in chemicals once thought to be safe. . . .

"When a nuisance results in contamination of property for an indefinite period of time, the proper measure of damages is the diminution of the market value of the property. This measure of damages is proper even when the source of the contamination has been abated [in this case tanks and distribution lines removed]. Permanent damages may be awarded even if the nuisance is classified as temporary. See Stockdale v. Agrico Chemical Co., Division of Continental Oil Co., 340 F.Supp. 244, 270 (N.D.Iowa 1972) ('It is said that there is no direct relationship between the classification of the nuisance and the classification of the injury . . . . It is possible for a temporary nuisance to result in permanent or temporary damages or both.') . . . Cases from other jurisdictions support the award of permanent damages in this case. See, e.g., Sinclair Refining Co. v. Bennett, 123 F.2d 884, 886-87 (6th Cir. 1941) (gasoline contamination of wells resulted in permanent damages even though contamination would dissipate over time); Idaho Gold Dredging Corp. v. Boise Payette Lumber Co., 52 Idaho 766, 22 P.2d 147 (1933) (grease and oil contamination of minefields results in permanent damages); Sunray DX Oil Co. v. Brown, 477 P.2d 67, 69 (Okla.1970) (permanent damage to realty can result from a temporary and abatable nuisance); Danciger Oil & Refining Co. v. Donahey, 205 Okla. 390, 393-94, 238 P.2d 308, 312 (1951) (permanent damages awarded for chemical contamination which will dissipate after several years); Lytle v. Payette-Oregon Slope Irrigation Dist., 175 Or. 276, 288, 152 P.2d 934, 939 (1944) (infestation of property with noxious weeds justified award of permanent damages); Gross v. Connecticut Mut. Life Ins. Co. 361 N.W.2d 259, 272-73 (S.D.1985) (injury which reduces the productivity of land justifies award of diminution of market value to the land); St. Louis Southwestern Ry. Co. v. Denton, 288 S.W. 476, 477 (Tex.Civ.App.1926); Akers v. Ashland Oil & Refining Co., 139 W.Va. 682, 691, 80 S.E.2d 884, 888-89 (1954) (even though oil contamination would eventually leave the ground, award of permanent damages is appropriate).

"The award of permanent damages based on the reduction of market value provides that the plaintiff's remedies stemming from this particular incident will be addressed in one legal action. Successive actions to recover temporary damages stemming from one incident, such as the action currently filed by Foster, are contrary to the goal of efficient legal remedies. . . .

"We conclude the proper measure of damages in this nuisance case is the difference between the market value of Foster's property immediately before contamination and the market value of that property after the contamination. . . ." (*Mel Foster Co. Prop.* v. *American Oil Co.*, *supra*, 427 N.W.2d 171, 174-176.)

The decision in *Mel Foster* makes a very strong argument for classifying injuries to land from contamination by toxics or hazardous materials as permanent nuisances. The decision also provides a cogent and compelling rationale for classifying these nuisances as permanent in every case. It is cumbersome, inefficient and contrary to the goal of efficient legal remedies to bring numerous and successive suits during the period the land remains contaminated despite remediation efforts. The *Mel Foster* court holds the better approach is to treat these cases as permanent nuisances so as to determine all damages, including diminution in value damages, once for all past, present and future harm in one action, even though the nuisance may be abated at some indefinite point in the future.

Nevertheless, the *Mel Foster* decision does not aid appellants. It does not support their argument diminution in value damages should be allowed in each of several potential successive suits on a claim for a temporary and continuing nuisance, as in this case. The *Mel Foster* decision reinforces the view it would have been to appellants' advantage to have pursued causes of action against ARCO for permanent trespass and permanent nuisance. However, appellants' claims for permanent trespass and nuisance were barred by the statute of limitations. Nor does the *Mel Foster* decision aid appellants to the extent it permitted diminution in value damages because it did not specifically consider whether "stigma" from the contamination played any role in the landowner's loss of either the use or enjoyment of his land. (Cf. *In re Tutu Wells Contamination Litigation* v. *Texaco Inc.* (D.V.I. 1995) 909 F.Supp. 991, 996, fn. 10 [describing an argument for decline in market value as an element of lost use and enjoyment of land as "controversial"]; but see *Adkins* v. *Thomas Solvent Co.* (1992) 440 Mich. 293 [487 N.W.2d 715, 721] [diminution of market value alone does not constitute an interference with the use or enjoyment of land giving rise to a claim for nuisance]; see generally, Cabot, *Post-Remediation 'Stigma' Damages Hinge on Hard Evidence of Residual Risk*, 8 Inside Litigation No. 9 (Oct. 1994) p. 27.)

However, claims for stigma damages are beginning to arise in cases throughout the nation in toxic contamination cases. Decisions from courts

which have entertained such claims appear to suggest stigma damages could be a proper element of damages in cases presenting substantial evidence the property suffers permanent physical injury despite remediation efforts. (See *F.D.I.C.* v. *Jackson-Shaw Partners No. 46 Ltd., supra,* 850 F.Supp. 839.) However, some courts have been reluctant to entertain such claims due to the amorphous nature of public fears of contaminated land and the inherent uncertainty and speculativeness of the extent, as well as the existence, of the stigma. At least one court has suggested owners of contaminated land could not recover damages for diminution in market value caused by stigma absent proof (1) their land suffered physical injury from the contamination, (2) remediation would not restore market value to a precontamination level, and (3) the contamination presented an ongoing risk to their land. (See *In re Paoli Railroad Yard PCB Litigation* (3d Cir. 1994) 35 F.3d 717, 795-798.)

On the other hand, courts have uniformly rejected claims of stigma damages absent evidence the plaintiff's own property suffered physical injury from the contamination. (See, e.g., *Adkins* v. *Thomas Solvent Co., supra* 440 Mich. 293 [487 N.W.2d 715, 721]; *Adams* v. *Star Enterprise* (4th Cir. 1995) 51 F.3d 417, 423; *Berry* v. *Armstrong Rubber Co.* (5th Cir. 1993) 989 F.2d 822, 829; *Leaf River Forest Products, Inc.* v. *Ferguson* (Miss. 1995) 662 So.2d 648, 662-665; *O'Neal* v. *Department of Army* (M.D.Pa. 1994) 852 F.Supp. 327, 336-337; *In re Paoli Railroad Yard PCB Litigation, supra,* 35 F.3d 717, 795-798.)

In this case appellants concede they have not suffered any costs of remediation or loss of use or enjoyment of their property. Appellants do not contend the nuisance was permanent, of indefinite duration or posed a threat of future injury. No case of which we are aware permits a plaintiff to recover diminution in market value damages caused by the stigma of contaminated land in this context, where the landowners claim the nuisance was abatable and temporary, rather than permanent or indefinite.

This may appear to be a harsh result. However, we are bound by the confluence of California law regarding recoverable damages in an action for continuing nuisance and appellants' failure to bring suit for permanent nuisance or permanent trespass within the statutory period. These circumstances combine to prevent appellants from receiving the damages they seek despite the possibility appellants' land may continue to suffer from stigma due to its history of contamination.

## DISPOSITION

The judgment is affirmed. Respondents to recover their costs of appeal.

Lillie, P. J., and Woods, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 2, 1996.